UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

NEW CONCEPT ENERGY, INC.,

                                        *Plaintiff*,                    Case No.: 18-cv-8896-VSB-RWL

                          – against –

GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,

                                        *Defendants*

------------------------------------------------------------------------x


## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

FORD O'BRIEN LLP

Adam Ford
Robert S. Landy
Danielle M. McLaughlin
575 Fifth Avenue
17th Floor
New York, New York 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
(212) 265-1047

*Attorneys for Defendants Guy Gentile
and Mintbroker International, Ltd.*

August 10, 2020

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................. i-iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................................... 3

LEGAL STANDARD ........................................................................................ 11

   I.    Fed. R. Civ. P. 56.1 Standard on Summary Judgment ................................... 11

ARGUMENT ................................................................................................... 12

   I.    Section 16(b) of the 1934 Securities Act Does Not Apply Here .................... 12

   II.   Defendants Were Never "Beneficial Owners" of the Shares and are Therefore not
        Subject to Rule 16(b)'s Disgorgement Rules ............................................. 13

       A.    Plaintiff has not Established that Defendants had any Voting Power in New
            Concept Securities .................................................................... 14

       B.    Plaintiff has not met its Burden to Demonstrate Defendants Purchased or Sold
            actual New Concept "Securities" .............................................. 15

       C.    Defendants had no Pecuniary Interest in actual New Concept Securities ............. 19

   III.   Defendants are not the Statutory Insiders that Section 16(b) is Designed to Safeguard
        Against ................................................................................................ 20

       A.    Defendants had no Access to Inside Information .................................... 21

       B.    Section 16(b)'s Perverse Incentives Create Unjust Windfalls for Companies and
            their Lawyers ........................................................................... 22

CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Aaron Rubenstein v. Lannett Company, Inc.,*
No. 1:16-cv-02935-PAE (April 20, 2016)..........................................................................25

*Bershad v. McDonough,*
428 F.2d 693, 696 (7th Cir. 1970). ..................................................................................20

*Blau v. Lamb*,
363 F.2d 507 (2d Cir. 1966) .............................................................................................21

*Bulldog Investors General Partnership v. Deborah Donoghue et al.*,
569 U.S. 994, 133 S. Ct. 2388, (cert. denied May 20, 2013) ...........................................22

*Celotex Corp. v. Catrett,*
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ..............................................11, 12

*Chechele v. 12 Sperling*,
Fed. Sec. L. Rep. P. 96786 (S.D.N.Y. Mar. 29, 2012], aff'd, 758 F3d 463 (2d. Cir. 2014) .....19

*Donoghue v. Bulldog Inv'rs Gen. P'ship*,
696 F.3d 170 (2d Cir. 2012) .............................................................................................13

*Donoghue v. Casual Male Retail Grp., Inc.,*
375 F. Supp. 2d 226 (S.D.N.Y. 2005) ..............................................................................12

*Donoghue v. Centillium Commc'ns Inc.*,
No. 05 Civ. 4082 (WHP), 2006 WL 775122 (S.D.N.Y. Mar. 28, 2006) .........................20

*Gallo v. Prudential Residential Servs. Ltd.,*
22 F.3d 1219 (2d Cir.1994) ..............................................................................................11

*Goenaga v. Mar. of Dimes Birth Defects Found.*,
51 F.3d 14, 18 (2d Cir. 1995) ..........................................................................................12

*Gollust v. Mendell*,
501 U.S. 115, 111 S. Ct. 2173 (1991) ..............................................................................12

*Gwozdzinsky ex rel. Revco D.S. v. Zell/Chilmark Fund, L.P.*,
156 F.3d 305 (2d Cir.1998) .................................................................................12, 15, 21

*In re Adler, Coleman Clearing Corp.,*
247 B.R. 51 (Bankr. S.D.N.Y. 1999), aff'd 263 B.R. 406 (S.D.N.Y. 2001).....................18

*In re: XO Communications, Inc.*
  330 B.R. 394, 426 (U.S. Bankr. Ct. S.D.N.Y. Sept. 23, 2005) ..................................................20

*Meridian Mortg. Corp. v. United States*,
  24 Cl. Ct. 811, *aff'd,* 980 F.2d 745 (Fed. Cir. 1992)..................................................................15

*Morales v. Holiday Inns, Inc.*,
  366 F. Supp 760 (S.D.N.Y. 1973) ...............................................................................................23

*Morales v. New Valley Corp*,
  999 F. Supp. 470 (S.D.N.Y. 1998) ........................................................................................13, 21

*Provident Secs. Co. v. Foremost-McKesson, Inc.*,
  331 F. Supp. 787 (N.D. Cal. 1971) *aff'd,* 506 F.2d 601 (9th Cir. 1974), aff'd, 423 U.S. 232
  (1976) ............................................................................................................................................21

*Reliance Electric Co. v. Emerson Elec. Co.*,
  404 U.S. 418, 92 S. Ct. 596 (1972) ......................................................................................20, 25

*Rosen v. Price*,
  No. 95 CIV. 5089 (CSH), 1997 WL 401793 (S.D.N.Y. July 16, 1997) ...................................12

*Rubenstein v. Live Nation Entm't*,
  No. 16 CIV. 7283, 2017 WL 2670749 (S.D.N.Y. June 20, 2017) ......................................20, 21

*Travelers Indem. Co. of Illinois v. 28 E. 70th St. Const. Co.*,
  296 F. Supp. 2d 476 (S.D.N.Y. 2003) .........................................................................................11

**Statutes and Rules**

Fed. R. Civ. P. 56.

Securities Exchange Act of 1934 Section 13

Securities Exchange Act of 1934 Section 16

17 C.F.R. § 240.16a–1(a)(2)(i) ........................................................................................

17 CFR § 240.13d-3(a) ...................................................................................................

**Treatises and Law Review Articles**

John E. Munter, SECTION 16(B) OF THE SECURITIES EXCHANGE ACT OF 1934: AN ALTERNATIVE TO BURNING DOWN THE BARN IN ORDER TO KILL THE RATS, 52 Cornell L. Rev. 71-72 (1966). ..21

Peter L. Romeo and Alan L. Dye, SECTION 16 TREATISE AND REPORTING GUIDE (4th ed. 2012) § 9.01[b]. .........................................................................................................................20

Pursuant to Fed. R. Civ. P. 56 and the Local Rules of the United States District Court for the Southern District of New York, Defendants, by their undersigned counsel, submit this Memorandum of Law in Support of their Motion for Summary Judgment.

## PRELIMINARY STATEMENT

The facts here—not the work of baseless fiction alleged in the Complaint, but the evidence actually adduced during discovery— make clear that this case never should have been brought.  What actually occurred falls outside the reach of Section 16(b) of the 1934 Securities Exchange Act, both its actual wording as well as its intent, even granting the statute its most liberal interpretation.  As proved beyond any doubt in discovery, Defendants here never took possession of any of Plaintiff's shares, nor could they have because the "trades" at issue were done rapidly and on an exchange where "trades" are not completed by the exchange of actual shares, but rather by "book entries" that are tied to the published share value.  These "book entries" are not trades in actual shares, but rather in derivatives of Plaintiff's shares, thus removing this case from the reach of Section 16(b) entirely.  These book entries do not grant voting or dividend rights, and, due to the speed at which the book entry positions were unwound, they never bestowed upon plaintiff any of the rights of a shareholder.

In addition, because of the sheer volume of book entries at issue – more than 2,000% of Plaintiff's available shares were purchased and sold by all market participants during the relevant period – there were simply never enough shares available to complete the transactions, even if they had not been reversed before settlement and clearing.  This "trading" could only be possible because of counterparties selling "naked" shorts, but in an environment where there were vastly insufficient actual shares to cover.  As such, Plaintiffs cannot present any evidence at trial to support their argument that Defendants ever became beneficial owners of more than 10% of

Plaintiff's shares.  Without this evidence, there is no material dispute of facts, and this case must be disposed of on summary judgment.

Beyond the facts of this unique case, the arguments regarding whether Section 16(b) applies here should be considered in the context of the policy prescriptions of the Section, and not in a vacuum.  This case is the latest in a line of more than three hundred other cases in the Southern District of New York alone in which Plaintiff's counsel have created their own personal cottage industry combing through SEC filings and then filing Section 16(b) cases that mostly - if not entirely - benefit Plaintiff's counsel, with the actual plaintiff issuer being dragged along for the ride.  These actions have, over decades, perverted the original policy considerations Congress intended to further and that underpin Section 16(b) – a mechanism designed *to prevent insider trading* –  by the practice of forced and aggressive, serial litigation, often against non-insiders, resulting in a combination of nuisance settlements and massive windfalls where the subject companies that were not harmed by the alleged short swing trading (and in some cases, like here, benefited from the trading at issue).  It is within this context that the Court should consider that Plaintiff has failed to meet its burden – and it *is* Plaintiff's burden – to demonstrate that Defendants were ever "beneficial owners" of actual New Concept securities subject to Section 16(b) liability.  The evidence overwhelmingly establishes that Defendants possessed no insider information, and traded in book entries or "positions" in New Concept securities: first, because it was a factual impossibility (even in a reality of modern high-speed trading) for Defendants to ever actually possess all of the securities that Plaintiff alleges Defendants bought and sold; and second, because Defendants exited a greater than 10% book-entry position in Plaintiff's securities before it could have come into possession of any actual stock.

Plaintiff cannot prove that the shares purported to have been purchased and sold by Defendants actually existed and were anything more than book entries of phantom shares because, under the particular circumstances of this case, those "book entry" trades could never have been settled with actual shares, as there simply were not nearly enough real shares available.  Therefore, Defendants are entitled to Summary Judgment as to all alleged short swing trading in New Concept "securities."  In the alternative, and to the extent the Court determines that there is an issue of material fact as to the number of New Concept shares Defendants "beneficially owned", Defendants seek a ruling requiring Plaintiffs to establish at trial that every share it alleges Defendants purchased or sold actually existed and came into Defendants' possession during the alleged short swing period.

<u>**STATEMENT OF FACTS AND PROCEDURAL HISTORY**</u>

***New Concept Energy***

New Concept Energy, Inc. ("New Concept") is a Dallas, Texas-based oil and gas drilling and exploration company.  Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("R-56.1") ¶ 1.  On May 24, 2018, Mintbroker International, Inc ("Mintbroker"), which is wholly owned by Defendant Guy Gentile, through its broker Interactive Brokers, opened a position in New Concept securities with the purported initial purchase of 100 shares.  R-56.1 ¶ 3. During this period and for the first six months of 2018, New Concept's share price ranged from approximately $1.26 to $1.89.  R-56.1 ¶ 2.  On September 25, 2018, Mintbroker closed its position in New Concept securities with the purported final sale of 1500 shares.  R-56.1 ¶ 4. During this period and for the last six months of 2018 after July 3, 2018, New Concept's share price ranged from approximately $4.95 to $1.40, with the share price sitting above $2.00 from July 30, 2018 until approximately December 14, 2019. R-56.1 ¶ 5.  Between its opening and

closing positions, Mintbroker undertook some 15,911 trades in purported New Concept securities. R-56.1 ¶ 7.

### *Mintbroker's SEC Filings*

On June 29, 2018, Defendant Mintbroker International, Ltd. ("Mintbroker") filed a SEC Form 3 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating that it had placed buy orders for 1,073,713 shares of New Concept. R-56.1 ¶ 8.  On July 3, 2018, Mintbroker filed a SEC Form 4 stating it had placed sell orders such that its position in New Concept Securities was reduced by 114,576 shares to 959,137 shares. R-56.1 ¶ 9. On September 17, 2018, Mintbroker filed a SEC Form13-D pursuant to Section 16(a) of the Securities Exchange Act of 1934, to which it attached all of its trading records reflecting positions in New Concept stock effected during the prior sixty days.  R-56.1 ¶ 10.  Mr. Gentile, by virtue of his relationship to MintBroker, noted in this form that he "*may* be deemed to indirectly beneficially own (as that term is defined in Rule 13d-3 under the Exchange Act of 1934, as amended) those Shares which MintBroker had owned" and that he "disclaim[ed] beneficial ownership of all such Shares for all other purposes."  *Id.*  (emphasis supplied).

### *The Complaint*

On September 28, 2018, just 11 days after Defendants filed their Form 13-D, Plaintiff filed a Complaint pursuant to Sections 16(a) and 16(b) of the 1934 Securities Exchange Act, as amended, 15 U.S.C. § 78a et seq., alleging Defendants had engaged in so-called "short swing" trading from June 29, 2018 at 10:05 a.m. until July 3, 2018 at 9:40 am.  Complaint, ECF Doc. No. 1, ¶ 26.  Setting aside that the Complaint was filled with irrelevant personal invective about Defendant Gentile that would be defamatory were it not privileged, Plaintiff sought by its

Complaint to disgorge "any and all short-swing trading profits Defendants may have realized through their purchases and sales of the Common Stock of New Concept during the six months period ending on or about July 3, 2018" which Plaintiff estimated to be "$6,160,334, more or less." *Id.* at ¶¶ 9; 28.  In rote language, and drafted as a virtual analog of the companion case brought by Avalon Holdings Corp., Plaintiff alleged that Defendants had, during that time, been "beneficial owners" of New Concept stock, and had increased their ownership of New Concept stock at one point to "roughly 50% of New Concept's total outstanding share issue of Common stock" during the alleged short swing period.  *Id.* at [unnumbered "nature of the action"]. Plaintiff alleged (contrary to the facts) that after the short swing trading set forth in its Complaint, "[t]he share trading of New Concept thereafter resumed its usual price and volume ranges."  *Id.* at ¶ 21.

### The role of the Depository Trust Co., and New Concept share ownership

A company's share register sets forth the legal owners of that company's stock.  R-56.1 ¶ 16.  These "registered owners" or "record owners" (the "record date" is the date upon which they legally own the shares) generally possess share certificates that "represent their ownership in the company."  *Id.*  Cede & Co is the nominee of the Depository Trust Co., ("DTC") a depository that legally owns the vast majority of publicly traded securities in the United States.  *Id.*  For each security, Cede & Co. owns a master certificate known as the 'global security,' which never leaves its vault.  *Id.*  Transactions on stock exchanges are recorded as debits and credits to DTC members' securities accounts, but the "registered" or "record" owner of most securities – DTC, through Cede & Co – remains the same.  *Id.*  DTC, through Cede & Co., is the registered holder of [DTC eligible securities], routinely processing dividend and interest payments and managing the electronic 'book-entry' transfer of interests in the securities at the direction of their customers, including ultimate beneficial owners.  *Id.*  New Concept shares are DTC eligible

securities.  R-56.1 ¶ 18.  Transactions involving street name shares are conducted using DTC's electronic' 'book-entry' system of accounting for share transfers.  R-56.1 ¶ 17.  When one participant's client sells shares in a particular company, that participant's DTC account is debited, and the purchasing participant's account is credited by the same amount.  *Id.*  DTC's 'book-entry' system negates the need to keep a large inventory of physical stock certificates.  *Id.* According to New Concept's transfer agent, the number of New Concept shares outstanding "through June 23, 2018" was 2,131,934.  R-56.1 ¶ 15.  The number of New Concept shares owned by "Cede & Co." "through June 23, 2018" and available for street-side trading was 1,923,676 (the "Float).  R-56.1 ¶ 19.

***Trading activity during the alleged Short Swing period***

Table A sets out the number of New Concept shares *purportedly* traded during the Alleged Short Swing period by all market participants, and those trades as a percentage of the Float:

| Table A: Market Participants | | |
|---|---|---|
| Date | All market trades (purchases and sales) | Trades as % of Float |
| 6/29/18 | 18,649,600 | 969% |
| 7/2/18 | 15,939,700 | 829% |
| 7/3/18 | 10,408,300 | 541% |
| TOTAL | 44,997,600 | 2,111% |

R-56.1 ¶¶ 20, 21, 24, 25, 28, 29, 32.

Table B sets out the number of New Concept securities *purportedly* traded during the Alleged Short Swing Period by all Interactive Brokers' customers, and those trades as a percentage of the Float:

6

| Table B: Interactive Brokers' Customers | | | | | | |
|---|---|---|---|---|---|---|
| Date | IB purchases | % of Float | IB sales* | % of Float | All IB trades (purchases + sales) | Trades as % of Float |
| 6/29 | 5,454,942 | 284% | 5,454,942 | 284% | 10,909,884 | 568% |
| 7/2 | 1,535,672 | 80% | 1,535,672 | 50% | 3,071,344 | 160% |
| 7/3 | 2,754,318 | 143% | 2,754,318 | 143% | 5,508,636 | 286% |
| TOTAL | 9,744,932 | 506.58 | 9,744,932 | 506.58% | 19,489,864 | 1014% |

*including "short sales"

R-56.1 ¶¶ 22, 23, 26, 27, 30, 31, 33.

Table C sets out the number of New Concept securities *purportedly* traded during the

Alleged Short Swing Period by Mintbroker, and those trades as a percentage of the Float:

| Table C: Mintbroker | | | | | | |
|---|---|---|---|---|---|---|
| Date | Mintbroker purchases | % of Float | Mintbroker sales* | % of Float | Mintbroker total trades | Trades as % of Float |
| 6/29/18 | 1,804,833 | 93.82% | 780,348 | 40.57% | 2,585,181 | 134.39% |
| 7/2/18 | 0 | 0% | 113,576 | 5.90% | 113,576 | 5.9% |
| 7/3/18 | 37,106 | 1.93% | 997,243 | 51.84% | 1,034,349 | 53.77% |
| TOTAL | 1,841,939 | 95% | 1,891,167 | 98.31% | 3,733,106 | 194.06% |

*including "short sales"

R-56.1 ¶¶ 35, 36, 37, 38.

***Settlement***

Prior to the relevant period, on May 22, 2017, the SEC amended Rule 15c6-1(a) required that all broker-dealer securities transactions settled two business days after a trading position is opened. R-56.1 ¶ 42. As the SEC explained in guidance, "When an investor sells a security, the investor must deliver to the brokerage firm the investor's security no later than two business days after the sale. For example, if an investor sells shares of a particular stock on Monday, the transaction would settle on Wednesday." R-56.1 ¶ 43. This rule is known as "T+2"and was effective as of September 5, 2017. R-56.1 ¶ 44. Interactive Brokers offered its clients T+2 settlement, but for a higher price, customers could opt into T+1 Settlement. R-56.1 ¶ 44. Defendants did not opt into T+1 settlement; the positions it opened on 6/29/18 did not settle until 7/3/18; positions opened on 7/2/18 did not settle until 7/5/18; and positions opened on 7/3/18 did not settle until 7/6/18. R-56.1 ¶¶ 45, 47, 49, 50, 51, 52, 53, 54. Mintbrokers' Interactive Brokers annual trading statements as well as its long activity statement set out separate line items for "starting cash", "ending cash", and "ending settled cash." R-56.1 ¶¶ 46, 47. This T+2 "settlement date" however is better described as a theoretical settlement date, as it has been established in discovery that even on T+2, actual shares are not transferred between accounts. There is no evidence in the records that Interactive Brokers obtained the actual shares necessary to "settle" the trades its customers placed.

### Short Selling and the "pool" of shares available for trading

The number of shares available for a short seller to borrow is necessarily less than the number of shares in the float of a given stock. R-56.1 ¶ 55. Despite this, the practice of "short selling" means that multiple brokers will attempt to short sell the same finite "pot" of shares on any given trading day, meaning there might be one million shares available, but many multiples of that amount of shares can be and are sold short every day. R-56.1 ¶ 57. Over the next two trading days, the "clearing function" means the shorted shares will either be borrowed and

8

delivered, or the short will be closed out because the shares are unavailable.  *Id.*  For example, if on a given trading day, market participants are looking to borrow shares to short sell five million shares, but only one million shares exist, only one million shares can be obtained and are available for delivery on that day.  R-56.1 ¶ 56.

***Short Selling and the "pool" of shares available for trading***

As the Interactive Brokers representative testified at deposition, when Interactive Brokers accepts an open trade from a customer, the brokerage routes the order to an exchange and then it is filled on the exchange by a counterparty.  R-56.1 ¶ 58.  Interactive Brokers does not know whether or not the counterparty, if not also an Interactive Brokers customer, actually owns the shares it purports to be selling or they are being sold naked short.  R-56.1 ¶ 59.  If a counterparty is not an Interactive Brokers' customer, these counterparties' identities are unknown.  Interactive Brokers does not place any securities into its customer's account until the trade has settled.  R-56.1 ¶ 60.

***Voting Shares***

Voting power is a legal incident to share ownership, which is vested in the legal owner of stock, which includes registered owners, who appear in the company's share registry, and DTCC, which registers the shares it owns under "Cede & Co."  R-56.1 ¶ 61.  Only Legal owners can vote shares.  *Id.*  However, DTC assigns to each market participant (including Interactive Brokers) the voting rights associated with particular shares in that participant's DTC account "as of the record date."  *Id.*  The "record date" is the date that a shareholder obtains legal ownership.  *Id.*  Absent special circumstances, proxy authority is never transferred down to the ultimate beneficial owners.  *Id.*  In order to vote shares, the customers of market participants may, by contract with the market participant, have the right to provide voting instructions to their bank or

broker, who, in turn, has the legal right to actually vote those shares.  R-56.1 ¶ 62.  A short seller never has any voting rights because it never takes possession of any shares.  R-56.1 ¶ 64.

While the 30b(6) deponent in this matter for Interactive Brokers testified that "generally speaking", a customer "may" have voting power in securities in which they have a long position where the customer actually owns the shares, he did not know if a customer could vote shares after an order had been placed but before the shares were placed into the customer's account (i.e., during the T+2 settlement period).  R-56.1 ¶¶ 63, 65.  This deponent did not establish that the contract between Interactive Brokers and Mintbroker enabled Mintbroker to provide voting instructions to Interactive Brokers, and nor did he establish that Mintbroker exercised any voting power during the period that it held a position in New Concept securities.  R-56.1 ¶ 66.

All of this leads to the obvious conclusion regarding Mintbroker's trading which Plaintiff must be able to disprove in order to establish its burden at trial: Given that the number of book-entry trades during the key days vastly exceeds the Float, Mintbroker's orders must have been filled by short sellers who were "naked", such that they would never have been able to deliver the referenced shares.  Moreover, the only reason the trades were not canceled was because Mintbroker made sales, such that all trades settled with cash only, regardless of whether there were ever shares available to consummate the transactions.  Given the volume of trades, and Interactive Broker's testimony that it would be impossible to know if the sellers actually possessed shares to sell to Mintbroker, Plaintiff cannot establish that Mintbroker ever became a 10% beneficial owner in actual existing shares, and thus could never establish its burden at trial.

***Counsel's involvement in The Short Swing Bar***

Counsel for Avalon, David Lopez, has brought some 325 Section 16(b)-related cases in the Southern District of New York since 1973.  R-56.1 ¶ 67. Lopez's co-counsel, Miriam Tauber, has brought some 45 Section 16(b)-related cases in the Southern District of New York since

2014.  R-56.1 ¶ 68.  Counsel have a small pool of shareholder-plaintiffs named Deborah

Donoghue, Richard Morales, Aaron Rubenstein, and Mark Rubenstein (and less recently, C.R.A.

Realty Corp), who they represent in 16(b) disgorgement cases.  Serial plaintiff Deborah

Donoghue has brought approximately 146 16(b)-related cases.  R-56.1 ¶ 69.  Serial plaintiff

Richard Morales brought approximately 88 16(b)-related cases prior to his death in or around

2001.  R-56.1 ¶ 70.  Deborah Donoghue is apparently related to Richard Morales and was

executrix of his will; Ms. Donoghue was substituted as plaintiff in eight of Mr. Morales' 16(b)

cases after his death in 2001.  R-56.1 ¶ 71.  Serial Plaintiff C.R.A. Realty Corp has brought

approximately 50 16(b)-related cases.  R-56.1 ¶ 71.  Serial plaintiff Aaron Rubenstein has

brought approximately 24 16(b)-related cases. R-56.1 ¶ 72.  Serial plaintiff Mark Rubenstein has

brought approximately ten 16(b)-related cases. R-56.1 ¶ 73.

## <u>LEGAL STANDARD</u>

I.   <u>Fed. R. Civ. P. 56.1 Standard on Summary Judgment</u>

Summary judgment may be granted where " the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." *Travelers Indem. Co. of Illinois v. 28 E. 70th St. Const. Co.*, 296 F. Supp. 2d

476, 478 (S.D.N.Y. 2003) *citing* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317,

106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); and *Gallo v. Prudential Residential Servs. Ltd.,* 22 F.3d

1219, 1223 (2d Cir.1994).  In moving for summary judgment against a party who will bear the

ultimate burden of proof at trial, the movant's burden is satisfied if she can point to an absence of

evidence to support an essential element of the nonmoving party's claim." *Goenaga v. Mar. of*

*Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) *citing Celotex Corp.* 477 U.S. at 322–

23.

**ARGUMENT**

I.     **Section 16(b) of the 1934 Securities Act Does Not Apply Here**

In order to recover disgorged profits pursuant to Section 16(b) of the 1934 Securities

Exchange Act, as amended, 15 U.S.C. § 78a et seq., (the "Act"), a Plaintiff must prove "there

was '(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a

shareholder who owns more than ten percent of any one class of the issuer' securities (4) within

a six-month period."  *Gwozdzinsky ex rel. Revco D.S. v. Zell/Chilmark Fund, L.P.*,156 F.3d 305,

308 (2d Cir.1998) (internal citations omitted) (emphasis added).  Section 16(b) renders

"beneficial owners" of more than 10% of a corporation's stock "liable to suits requiring them to

disgorge their profits even if they did not trade on inside information or intend to profit on the

basis of such information."  *Donoghue v. Casual Male Retail Grp., Inc.,* 375 F. Supp. 2d 226,

231 (S.D.N.Y. 2005) *citing Gollust v. Mendell*, 501 U.S. 115, 122, 111 S. Ct. 2173, 2178 (1991).

*See also Rosen v. Price*, No. 95 CIV. 5089 (CSH), 1997 WL 401793, at *1, (S.D.N.Y. July 16,

1997) (noting that the statute has been described as "harsh," "crude," and "Draconian") and

*Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 174 (2d Cir. 2012) ("Section 16(b)

"recruits the issuer (and, if necessary, its security holders) as 'policemen' by imbuing them with

'a private-profit motive' to enforce the law's prohibition on short-swing trading by insiders.")

(internal citations omitted).

II.    **Defendants Were Never "Beneficial Owners" of the Shares and are Therefore not
       Subject to Rule 16(b)'s Disgorgement Rules.**

Section 16 requires a "two-tier" analysis to determine whether is an individual can be

classified as a beneficial owner of shares.  *Morales v. New Valley Corp*, 999 F. Supp. 470, 473,

(S.D.N.Y. 1998).  SEC Rule 16a–1(a) provides that, in determining whether an individual is a

beneficial owner under § 16(b) of the Act, courts should look to the definitions under § 13(d) of the Act.  Section 13(d), 17 CFR 240.13d-3(a), provides in relevant part:

(a) For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

  (1) Voting power which includes the power to vote, or to direct the voting of, *such security*; and/or,

  (2) Investment power which includes the power to dispose, or to direct the disposition of, *such security*. (Emphasis added).

Once status as a ten percent beneficial owner of actual shares is established, "the reporting and short-swing profit provisions of section 16 apply only to those securities in which the insider has a pecuniary interest." *Id.*  Pecuniary interest is defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the *subject securities*." 17 C.F.R. § 240.16a–1(a)(2)(i) (emphasis added).  All of these factors share a common requirement: that there be an actual security of the issuer over which the investor obtains the required dominion.

As set out below, because Plaintiff cannot establish that during the Alleged Short Swing period, Defendants (1) had any voting power in actual and existing New Concept securities; (2) ever owned or possessed actual and existing New Concept securities; and, (3) had any pecuniary interest derived from transactions in actual and existing New Concept securities, Plaintiff cannot establish that Defendants were ever "beneficial owners" of New Concept securities subject to Section 16(b) liability and summary judgment must be granted in Defendants' favor.

### A.    Plaintiff has not Established that Defendants had any Voting Power in New Concept Securities.

There is no document or testimony in the record that demonstrates that Defendants possessed any voting power in a single New Concept security, let alone in over 10% of New Concept securities.

Voting power is a legal incident to share ownership, which is vested in the legal owner of stock, which include registered owners, who appear in the company's share registry, and DTCC, which registers the shares it owns under "Cede & Co."  R-56.1 ¶ 61.  DTC assigns to each market participant (including Interactive Brokers) the voting rights associated with particular shares in that participant's DTC account "as of the record date*."  Id.*  In order to vote shares, the customers of market participants, such as Mintbroker, may, by contract with their broker, provide voting instructions to their broker, who, in turn, has the legal right to actually vote those shares due to DTC's assignment.  R-56.1 ¶ 62.

Interactive Brokers' 30b(6) deponent Brad Klauseger testified that "generally speaking", a customer "may" have voting power in securities in which they have a long position, but could not say that Defendants definitively did.  R-56.1 ¶ 63.  No document or testimony established that the contract between Interactive Brokers and Mintbroker gave Mintbroker the right to provide voting instructions to Interactive Brokers, or that such instructions were ever given.  Moreover, and crucially here, Mr. Klauseger did not know if a customer could vote shares after an order had been placed but before the shares were placed into the customer's account.  R-56.1 ¶ 65.

On the discovery record here, Plaintiffs cannot establish that Defendants possessed any actual New Concept securities during the alleged Short Swing period because the shares they purported to "purchase" did not exist and because those book entry "purchases" never "settled"

as the book entries were reversed with book entry sales prior to settlement.  In addition, Any

purchases from short sales made by Mintbroker, some 169 during the Alleged Short Swing

Period, granted Mintbroker no voting power.  R-56.1 ¶ ¶ 13, 64.  It should go without saying, but

if an investor sells shares they do not have (short), and there are insufficient shares in the market

to cover that short, the purchaser will never obtain voting rights (among other things).  Because

Plaintiffs cannot establish that Defendants had any voting power in New Concept securities

during the Alleged Short Swing Period, they have not satisfied the first prong of 17 CFR

240.13d-3(a).

**B.      Plaintiff has not met its Burden to Demonstrate Defendants Purchased or Sold Actual New Concept "Securities"**

In order to disgorge short-swing profits under Section 16(b) of the 1934 Act, a Plaintiff

must be able to prove "(1) a purchase and (2) a sale of securities (3) by an officer or director of

the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's

securities (4) within a six-month period."  *Gwozdzinsky*, 156 F.3d at 308.  No evidence in the

record supports this contention.

1.      *The "Trades" are Mere Book Entries*

Since August 1986, all marketable securities, whether classified as definitive or not, have

been treated as issued in book-entry form.  *Meridian Mortg. Corp. v. United States*, 24 Cl. Ct.

811, 815, *aff'd,* 980 F.2d 745 (Fed. Cir. 1992).  Cede & Co, the nominee of DTC, possesses all

DTC-eligible share certificates, including those of New Concept Energy not owned by the small

number of registered shareholders.  R-56.1 ¶¶ 16, 18.  Rather than exchanging share certificates,

"securities traders" participate in transactions which record trades as debits and credits in their

securities account.  R-56.1 ¶ 17.  As relevant here, the amount of outstanding stock in New

Concept during the alleged short swing period was 2,131,934 shares. R-56.1 ¶ 15.  The number

of street-side securities available for trading (i.e., owned by Cede & Co.), was 1,923,676 (the "Float").  R-56.1 ¶ 19.

Plaintiffs allege that Defendants owned more than 10% of the outstanding stock of New Concept between June 29, 2018 and July 3, 2018, and that at one point, Defendants actually "owned" 50% of New Concept stock.  Complaint  ¶¶ 9, 28.  No evidence whatsoever supports this assertion.  While the Interactive Brokers trading records show book entries for a greater than 10% position in New Concept stock on June 29, 2018, and additional book entries exiting a greater than 10% position in New Concept stock on July 3, these entries do not reflect the possession of actual shares, nor can they because they do not account for the T+2 settlement period.  Because of the two-business day lag between any shares settling and Defendants potentially obtaining possession of any New Concept securities, these records reflect only a "position" related to New Concept stock.  The Interactive Brokers activity statements reflect this reality, with lines for "cash" and "settled cash."  R-56.1 ¶ 48.  Indeed, it is mathematically and logically impossible for Defendants to have actually possessed the requisite threshold shares on June 29 (or any day in the "Short Swing window).  On June 29, 2018, the largest volume trading day of the alleged Short Swing period, market participants purchased and sold over 18 million New Concept "shares" - this is nearly 1,000% of the New Concept shares actually in existence. R-56.1 ¶ 21.  On the same day, all of Interactive Brokers' customers purported to "purchase" nearly five and a half million New Concept shares, which is equivalent to purchasing the company twice over.  R-56.1 ¶ 22.  Defendants themselves purported to "purchase" 1.8 million New Concept shares on June 29, 2018, representing 94% of the Float, or *almost the entire company*.  R-56.1 ¶ 34.  The entire Alleged Short Swing window features such impossibilities: Interactive Brokers' customers purported to purchase more than 100% of the actual shares

available on two of the three trading days in question, and all market participants purported to purchase and sell, or sell and purchase between 500% and nearly 1000% of the actual New Concept shares in existence during that same window. R-56.1 ¶¶ 52-54 and pp. 6-7 *supra*. These mathematical anomalies make clear that Mintbroker never acquired an interest any actual shares that could be counted in a beneficial ownership analysis, much less an interest sufficient to satisfy the 10% threshold -  because there simply weren't enough actual shares in the Float to enable every purchaser to take possession of every share they purported purchase and then sell. But this is nonetheless Plaintiff's burden to show.

Moreover, as Interactive Brokers' 30(b)(6) deponent testified, the finite "pot" of securities available for short selling in any listed company on any given trading day is necessarily smaller than the number of shares in the float.  R-56.1 ¶ 55.  Mr. Klauseger did not testify to the specifics of the New Concept Float, or the extent to which one or many market participants took short positions in New Concept securities.  However, when presented with a hypothetical, he acknowledged that the number of shares in the "pot" available to short might be one million, but two brokers could feasibly each take a short position for those million shares, meaning there would be short sales of two million shares when only one million actual shares existed that could be available to cover the short positions.  R-56.1 ¶ 57.  *Such an event does not create more shares*.  Rather, it means that many of the short sales could never settle because the sales did not represent actual and deliverable stock.  The fact that 2,111% of New Concept's Float purported to exchange hands during the alleged Short Swing period – and that Mintbroker alone purported to purchase and sell nearly twice amount of the entire Float – leads to the unavoidable conclusion that an unknown, but large portion of the "trades" were in fact naked short sales by market participants purporting to borrow the same, limited number of shares

available for actual trading. Plaintiff has not and cannot establish otherwise, making any trial here unnecessary.

      2.     *Defendants Never Owned Actual Securities and so did not "Transact in the Securities"*

The trade date reflects "pending transactions" made on that date, whereas the settlement date is the date that reflects the "actual balance posted to [a] customer account as of [the] settlement date", and is the date upon which "the cash proceeds from the sale of a security are available" to an investor. *See In re Adler, Coleman Clearing Corp.,* 247 B.R. 51, 84 (Bankr. S.D.N.Y. 1999), aff'd 263 B.R. 406 (S.D.N.Y. 2001).

The Interactive Brokers trade blotter establishes that Mintbroker took a long position in 1,804,833 shares in New Concept stock on June 29, 2018. R-56.1 ¶ 34. Those book entry "purchases" did not settle, and those securities were not deposited into Mintbroker's proprietary trading account by Interactive Brokers, until July 3, 2018 - the last day of the Alleged Short Swing period. R-56.1 ¶ 52. Mintbroker never had possession of those 1.804 million shares because it had exited the book-entry position entirely before it could have settled (or failed to settle, as would have been the case here): Mintbroker had book entry sales in the amount of 780,348 shares on June 29, 2018 (including short sales), a further 113,576 shares on July 2, 2018, and a further 997,243 shares (including short sales) on July 3,[1] reducing its June 29, 2018 book-entry position by a total of 1,891,167 shares. R-56.1 ¶¶ 34 -37. In other words, even if the shares Mintbroker "purchased" on June 29, 2018 existed (they did not), because Mintbroker did not possess the 1.804 million New Concept securities it purported to purchase on June 29, 2018

---

[1] Defendants also took a long position in 37,106 New Concept shares on July 3, 2018, but that book entry did not settle until July 6, 2018, long after the alleged short swing period concluded. Even counting this long position into Defendants' net position at the end of the short swing period, Defendants' position in New Concept securities was still negative, at -49,228.

before it exited that position in an amount of 1.891 million shares, Mintbroker actually held a

*negative position* in the subject securities for the entire Alleged Short Swing Period.[2]

### C.    Defendants had no Pecuniary Interest in the Securities

Pecuniary interest is defined as the "opportunity, directly or indirectly, to profit or share

in any profit derived from *a transaction in the subject securities*" (Rule 16a-1(a)(2)(i)).

(Emphasis added). Cash—but not "settled cash"—was variously credited and debited to

Defendants' trading accounts during the relevant trading period.  R-56.1 ¶¶ 46-48.  Moreover,

because Defendants did not transact in the actual subject securities, but mere book entries, and

because Defendants could not have taken possession of any actual New Concept securities

allegedly purchased until they had entirely exited their alleged 10% position, they had no

"pecuniary interest" in New Concept *securities* at the relevant time.  Again here, it is Plaintiff's

burden to prove that Mintbroker had a pecuniary interest in actual "subject securities."  It cannot.

### III.    <u>Defendants are not the Statutory Insiders that Section 16(b) is Designed to Safeguard Against.</u>

"When a transaction does not fall within the literal terms of Section 16(b), the statute

must be interpreted in a way that is consistent with its legislative purpose."  *Chechele v. 12*

*Sperling*, Fed. Sec. L. Rep. P. 96786 (S.D.N.Y. Mar. 29, 2012], aff'd, 758 F3d 463 (2d. Cir.

2014).[3]  As such, "Section 16(b) liability depend[s] on 'whether the transaction may serve as a

vehicle for the evil which Congress sought to prevent—the realization of short-swing profits

based upon access to inside information.'"  *Id. quoting Donoghue v. Centillium Commc'ns Inc.*,

---

[2] Plaintiff has not established at what time on July 3, 2020 that the 1.804 million shares settled, and taking the adverse inference that the last of Defendants' "sales" on July 3, 2020 occurred before the June 29, 2018 share "purchase" settled, Defendants also had a net negative position of -86,334 in New Concept "shares" on July 3, 2018, the last day of the alleged Short Swing period.

No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *5 (S.D.N.Y. Mar. 28, 2006).  Because this case

involves trading in phantom shares (i.e. trading in amounts that vastly exceeded the actual Float

available to buy or sell) akin to trading in derivatives of shares, these transactions do not fall

withing the literal terms of Section 16(b) and a consideration of the legislative purpose is

required.

The purpose of Section 16(b) is "to protect security holders from statutory insiders who

unfairly abuse their access to inside information in dealing with the issuing corporation's

securities and to protect the integrity of the equity markets."  *In re: XO Communications, Inc.*

330 B.R. 394, 426 (U.S. Bankr. Ct. S.D.N.Y. Sept. 23, 2005).  Congress saw 16(b) as a

"relatively arbitrary rule capable of easy administration."  *Reliance Electric Co. v. Emerson Elec.*

*Co.*, 404 U.S. 418, 422, 92 S. Ct. 596 (1972) *quoting Bershad v. McDonough,* 428 F.2d 693, 696

(7th Cir. 1970).  But this "arbitrary rule" has gained a reputation for injustice and exploitation,

not least because Section 16(b) has no scienter component and decades ago some courts found

that "there is, in effect, a conclusive presumption that the insider traded on the basis of inside

information when conducting a short-swing transaction.... [I]ssues of scienter, materiality,

reliance and causation ... are irrelevant."  Peter L. Romeo and Alan L. Dye, SECTION 16

TREATISE AND REPORTING GUIDE (4th ed. 2012) § 9.01[b].  *Rubenstein v. Live Nation Entm't*,

No. 16 CIV. 7283, 2017 WL 2670749, at *2 (S.D.N.Y. June 20, 2017).[4]  Numerous courts have

noted that history has shown 16(b) "to be an 'extremely crude rule of a most deformed and

misshapen thumb.'"  *Provident Secs. Co. v. Foremost-McKesson, Inc.*, 331 F. Supp. 787, 792

---

[4] In contrast, when a group pursuant to Section 13(d) is alleged to have 16(b) liability, "a
common objective among its members is required." *Morales v. Quintel Entm't, Inc.,* 72 F. Supp.
2d 344, 348 (S.D.N.Y. 1999), *aff'd in part, vacated in part,* 249 F.3d 115 (2d Cir. 2001).

(N.D. Cal. 1971) *aff'd,* 506 F.2d 601 (9th Cir. 1974), aff'd, 423 U.S. 232 (1976).  As the Second

Circuit pointed out in *Blau v. Lamb*, 363 F.2d 507, 515 (2d Cir. 1966), "Congress decided in

order to throw out the bathwater that the baby had to go too."

### A.      Defendants had no Access to Inside Information

Section 16(b) polices trading of securities by insiders.  It "seeks to deter 'insiders,' who

are presumed to possess material information about the issuer, from using such information as a

basis for purchasing or selling the issuer's equity securities at an advantage over persons with

whom they trade."  *Rubenstein v. Live Nation Entm't* at *2, *citing Gwozdzinsky*, 156 F.3d at 308.

Defendants here had no access to inside information, and so could not possibly have used such

information to their advantage over any other market participant, and Plaintiffs have not alleged

as such.

### B.      Section 16(b)'s Perverse Incentives Create Unjust Windfalls for Companies and their Lawyers

Notwithstanding the one-time sound principles underlying 16(b), "it has significant flaws

in terms of the administration of justice" as "the structure of the statute creates recovery for

companies that have not been harmed, and perverse incentives for lawyers to institute actions

solely for the purpose of obtaining legal fees."[5]

While "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment, *Morales v. New Valley

Corp.*, 999 F. Supp at 472, the facts below (which are not, in fact, in dispute) are presented to

impress upon the court that this case not only fails to fit into the Section 16 paradigm, but this

---

[5] John E. Munter, SECTION 16(B) OF THE SECURITIES EXCHANGE ACT OF 1934: AN ALTERNATIVE TO BURNING DOWN THE BARN IN ORDER TO KILL THE RATS, 52 Cornell L. Rev. 71-72 (1966).

lawsuit does not serve the policy ends that Section 16(b) was enacted to further, and in fact further perverts them.

The "specialty bar" of lawyers who sift through publicly available forms filed by purported 10% holders with the Securities and Exchange Commission is well known. *See, e.g., Bulldog Investors General Partnership v. Deborah Donoghue et al.*, 569 U.S. 994, 133 S. Ct. 2388, (cert. denied May 20, 2013). Such lawyers "look[] for such transactions, from which they can then profit through fee awards in § 16(b) lawsuits. These lawyers employ house plaintiffs to buy a nominal amount of the stock and sue." *Id. In Bulldog Investors*, "Respondent Deborah Donoghue ("Donoghue"), a serial § 16(b) plaintiff, and her regular § 16(b) lawyer [David Lopez], followed this process and sued Bulldog derivatively on Invesco's behalf, in the United States District Court for the Southern District of New York. *Id.*

This case (like *Bulldog Investors*) is one of 325 Section 16(b)-related cases brought by Plaintiff's counsel Lopez in the last thirty years in the Southern District of New York *alone*. R-56.1 ¶ 67. Lopez has, for decades, largely used the same small pool of plaintiff "shareholders"; Ms. Tauber has done the same since 2014 – Deborah Donoghue of New York (approximately 146 cases), Richard Morales of New York (approximately 88 cases), C.R.A. Realty Corp. (approximately 50 cases); Aaron Rubenstein (approximately 23 cases); Mark Rubenstein (approximately 10 cases) (a review of this memorandum of law's table of authorities is telling of this fact). R-56.1 ¶¶ 68-74. Donoghue and Morales are apparently related (she was executrix of his will and substituted as plaintiff in all of his S.D.N.Y. 16(b) claims after his death).[6] R-56.1 ¶

---

[6] *Donoghue, et al v. Flightserv.Com, et al.*, No. 1:00-cv-03987-JSM*; Donoghue, et al v. Miracor Diagnostics, et al.*, No. 1:00-cv-06696-JGK; *Morales, et al v. Natural Microsystems, et al.*, No. 1:01-cv-00708-RWS; *Morales, et al v. CT Holdings Inc., et al.*, No. 1:01-cv-01303-KMW-KNF; *Donoghue v. Integrated Business, et al.*, No. 1:01-cv-02407-KMW; *Donoghue v. Opti, Inc., et al.*

71.  This small band of litigants has operated for years to force companies to bring 16(b) suits whether they wish to or not.  *See, e.g., Morales v. Holiday Inns, Inc.*, 366 F. Supp 760, 762 (S.D.N.Y. 1973) and have brought hundreds of cases in the Southern District on behalf of companies that were not harmed (and which may not have wished to file suit in the first place). Many cases settle within a few months of being brought.[7]

Here, New Concept was not harmed by Defendants' trading activity.  In fact, New Concept's high share price in the six months following the Alleged Short Swing Period was 161% higher than the high share price in the six months preceding the Alleged Short Swing Period.  R-56.1 ¶ 6.  Not only was the company not harmed by the trading at issue, it reaped a windfall.  Any disgorgement in this case would simply be a windfall on a windfall.[8]

## CONCLUSION

This case involves high-speed computer trading by non-insiders who "purchased" shares that could not possibly exist, and who did not take possession of any New Concept securities allegedly purchased until they had entirely exited their alleged 10% position.  This set of facts does not present transactions "in which the possibility of abuse [is] intolerably great.  *Reliance*, 404 U.S. at 422.  This is simply not a 16(b) case.  For all of the foregoing reasons, Defendants

---

No. 1:01-cv-02447-MP; *Donoghue v. Equitex, Inc., et al.*, No. 1:01-cv-06132-WK*; Donoghue v. Spatializer Audio, et al.*, No. 1:01-cv-07286-AKH.  R-56.1 ¶ 71.

[7] E.g., (a sampling of cases brought by plaintiff Richard Morales): *Morales v. Underwriters Group, et al.*, No 1:93-cv-06228-LAP (filed 9/7/1993, closed 11/17/1993); *Morales v. IEC Electronics, et al.*, No 1:00-cv-017553-BSJ, (filed 3/7/00, closed 7/29/00; *Morales v. Coleman Co. In., et al.*, No. 1:00-cv-02482-VM (filed 3/31/11, closed 5/1/00); *Morales v. Memberworks Inc., et al.*, No. 1:00-c-03122-JSM (filed 4/24/00, closed 8/28/00); *Morales v. Zale Corporation, et al.*, No. 1:95:cv-01653 (filed 3/10/95, closed 4/19/95). *See generally* R-56.1 ¶ 70.

[8] E.g., following the filing of *Huppe v. Special Solutions Fund III QP, L.P.* and six years of litigation thereafter, Ayro informed shareholders that a settlement reached by Huppe, a shareholder of Ayro (also a Lopez client) and the alleged short-swing shareholders in the case constituted $529,280 in disgorgement of short-swing profits, less the fees and expenses agreed upon by the plaintiffs of $272,539 leaving a remainder of $254,361 for Ayro, which would be "recorded *as additional paid-in capital*."  *Id.*  (Emphasis added).

respectfully request that this Court grant its motion for summary judgment and in the alternative, a ruling requiring Plaintiffs to establish at trial that every share it alleges Defendants purchased or sold actually existed and came into Defendants' possession.

FORD O'BRIEN LLP


  /s/ Danielle M. McLaughlin  
Adam Ford
Robert S. Landy
Danielle M. McLaughlin
575 5th Avenue, 17th Floor
New York, NY 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
*Attorneys for Defendants Guy Gentile and Mintbroker International, Ltd.*

Dated: New York, New York
      August 10, 2020