UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

NEW CONCEPT ENERGY, INC.,

                    *Plaintiff,*

    – against –                Case No.: 18-cv-8896-VSB-RWL

GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,

                    *Defendants*

------------------------------------------------------------------------x

### DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT IN SUPPORT OF THEIR MEMORANDUM OF LAW IN OPPOSITION TO NEW CONCEPT ENERGY INC.'S MOTION FOR SUMMARY JUDGMENT

Defendants Guy Gentile and Mintbroker International, Ltd. hereby submit this Local Civil Rule 56.1 Statement in Support of their Memorandum of Law in Opposition to Plaintiff New Concept Energy's Motion for Summary Judgment to set forth the material facts to which it contends there is a genuine issue to be tried.

1. Undisputed.

2. Undisputed.[1]

3. Undisputed.

4. Undisputed.

---

[1] There is a *de minimus,* non-material dispute as to number of outstanding GBR shares (2,131,935 shares according to Plaintiff, 2,131,934 shares according to Defendants, *see* Defendant's Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, ECF Doc. No. 66 ("R-56.1") at ¶ 15; Declaration of Danielle M. McLaughlin in Support of Defendants' Motion for Summary Judgment, ECF Doc. No. 67 ("McLaughlin Decl.") at Exhibit 8.

5. Undisputed.

6. Undisputed

7. Disputed.  "Beneficial ownership" is a legal conclusion based upon a disputed factual analysis regarding whether "shares" existed to support the trading activity listed.  As set forth in Defendants' Rule 56.1(a) Statement (ECF Doc No. 66 at ¶¶ 19-37, 55-60), there is no clear evidence that the trades at issue reflected actual shares that could have been purchased or sold.  Statement 7 here wrongly presumes the existence and availability of such shares.  Additionally, this paragraph does not comply with Local Civil Rule 56.1(d).

8. Disputed.  "Beneficial authority" and "beneficial ownership" are legal conclusions based upon a disputed factual analysis regarding whether "shares" existed to support the trading activity.  As set forth in Defendants' Rule 56.1(a) Statement (ECF Doc No. 66 at ¶¶ 19-37, 55-60), there is no clear evidence that the trades at issue reflected actual shares that could have been purchased or sold.  Statement 8 here wrongly presumes the existence and availability of such shares.  Additionally, this paragraph does not comply with Local Civil Rule 56.1(d).

9.

| Date | 6/29 | 7/2 | 7/3 |
|---|---|---|---|
| MintBroker Buys (Ex. H) | 1,804,833 | 0 | 0 |
|  | *Not Disputed* | *Not Disputed* | *Disputed* |
| MintBroker Sells (Ex. H) | 780,348 | 113,576 | 960,137 |
|  | *Not Disputed* | *Not Disputed* | *Disputed* |
| MB position (end of day) (% of GBR) | 1,024,485 (48.05%) | 910,909 (42.73%) | 0 |

|  | *Disputed as to nature of calculation* | *Disputed only as to nature of calculation* | *Disputed* |
|---|---|---|---|
| GBR Trading Vol. (Ex. I) | 18,649,600 | 15,939,700 | 10,408,300 |
|  | *Not Disputed* | *Not Disputed* | *Not Disputed* |
| Fails to Deliver (Ex. J) | 22,848 | 57,631 | 190,839 |
|  | *Not Disputed* | *Not Disputed* | *Not Disputed* |

Disputed as to the term "beneficial ownership" as set out in statement 8, *infra*. Disputed as set out in red font in the table above, and in Paragraphs 32-36 *supra*. Moreover, other than the trades that resulted in failures to deliver, as set forth in in Plaintiff's Exhibit J, there is no clear evidence that the trades at issue reflected actual shares that could have been purchased or sold. Statement 9 here wrongly presumes the existence and availability of such shares.

10. Disputed. "Pecuniary interest" is a legal conclusion based upon a disputed factual analysis regarding whether "shares" existed to support the trading activity listed. As set forth in Defendants' Rule 56.1(a) Statement (ECF Doc No. 66 at ¶¶ 19-37, 55-60), there is no clear evidence that the trades at issue reflected actual shares that could have been purchased or sold. Statement 10 here wrongly presumes the existence and availability of such shares. Additionally, this paragraph does not comply with Local Civil Rule 56.1(d).

11. Undisputed.

12. Disputed. The existence of "joint and several liability" is a legal conclusion not suitable for inclusion in a Local Civil Rule 56.1 Statement of Facts. Moreover, the unknown substantive arguments contained in certain unknown "further submissions by the parties" are not undisputed material facts and are therefore not suitable for inclusion in a Local

3

Civil Rule 56.1 Statement of Facts.  Finally, this paragraph does not comply with Local Civil Rule 56.1(d).

13. Disputed.  The computation utilized to calculate short swing profits is a legal conclusion not suitable for inclusion in a Rule 56.1 Statement of Facts.  Additionally, this paragraph does not comply with Local Civil Rule 56.1(d).

14. Disputed. What Plaintiff seeks by its motion (a referral of the issues of damages to a special master) is not an undisputed material fact suitable for inclusion in a Rule 56.1 Statement of Facts.  Additionally, this calculation of damages is disputed because Defendants dispute Plaintiff's assertions related to trading and settlement activity, *see* Paragraphs 32-49 *supra*.

**ADDITIONAL MATERIAL FACTS**

15. On May 24, 2018, Mintbroker, International, Ltd. ("Mintbroker") through Interactive Brokers, opened a position in New Concept securities with the purchase of 100 shares. Defendant's Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, ECF Doc. No. 66 ("R-56.1") at ¶ 3; Declaration of Danielle M. McLaughlin in Support of Defendants' Motion for Summary Judgment, ECF Doc. No. 67 ("McLaughlin Decl."), Exhibit 3.

16. On September 25, 2018, Mintbroker closed its position in New Concept securities with the sale of 1500 shares.  R-56.1 ¶ 4; McLaughlin Decl. Exhibit 4.

17. For approximately the last six months of 2018, after July 3, 2018, New Concept's closing share price ranged from approximately $4.95 to $1.40, with the closing share price sitting above $2.00 from July 30, 2018 until approximately December 14, 2019.  R-56.1 ¶ 5; McLaughlin Decl. Exhibit 2.

18. The highest closing share price of $4.95 in the second half of 2018 represents a 161% increase over the highest closing share price of $1.89 in the first half of 2018, and the lowest closing share price of $1.40 in the second half of 2018 represents a 17.6% increase over the lowest closing price of $1.26 in the first half of 2018.  R-56.1 ¶ 6; McLaughlin Decl. Exhibit 2 and ¶ 4.

19. Between its opening and closing positions, Mintbroker undertook some 15,911 trades in purported New Concept securities.  R-56.1 ¶ 7; McLaughlin Decl. ¶ 6.

20. On June 29, 2018, Defendant Mintbroker filed a SEC Form 3 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating that it had taken a position in 1,073,713 shares of New Concept Energy, Inc.  R-56.1 ¶ 8; McLaughlin Decl. Exhibit 5.

21. On July 3, 2018, Mintbroker filed a SEC Form 4 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating it had decreased its position in New Concept securities by 114,576 shares to 959,137 shares.  R-56.1 ¶ 9; McLaughlin Decl. Exhibit 6.

22. On September 17, 2018, Mintbroker filed a SEC Form13-D pursuant to Section 16(a) of the Securities Exchange Act of 1934, to which it attached all of its trading records reflecting positions in New Concept stock effected during the prior sixty days by Mintbroker.  R-56.1 ¶ 10; McLaughlin Decl. Exhibit 7.

23. The period during which Defendants purported to hold more than 10% of the outstanding common stock of New Concept is June 29, 2018 at 10:05 a.m. until July 3, 2018 at 9:38 a.m., comprising three trading days: June 29, July 2, and July 3 (excluding June 30 and July 1, a weekend) (the "Alleged Short Swing Period").  R-56.1 ¶ 11; McLaughlin Decl. ¶ 11.

24. Defendants made 13,067 trades during the Short Swing Period. R-56.1 ¶ 12; McLaughlin Decl. ¶ 12.

25. Defendants made 169 short sales during the Alleged Short Swing Period, for a total of 18,253 "shares." R-56.1 ¶ 13; McLaughlin Decl. ¶ 13.

26. Based upon the trading records produced by Interactive Brokers (that do not account for settlement dates), Defendants' maximum position was 53% of the New Concept outstanding stock on June 29, 2018 at 1:07 p.m. R-56.1 ¶ 14; McLaughlin Decl. ¶ 14.

27. The number of New Concept shares outstanding "through June 23, 2018" was 2,131,934. R-56.1 ¶ 15; McLaughlin Decl. Exhibit 8.

28. The number of street side shares owned by "Cede & Co." through June 23, 2018 and *actually available* for trading on securities exchanges was 1,923,676 (the "Float). R-56.1 at ¶ 17; McLaughlin Decl. Exhibit 9, at 12-6.

29. Table A sets out the number of New Concept shares *purportedly* traded during the Alleged Short Swing period by all market participants, and those trades as a percentage of the Float:

| Table A: Market Participants | | |
|---|---|---|
| Date | All market trades (purchases and sales) | Trades as % of Float |
| 6/29/18 | 18,649,600 | 969% |
| 7/2/18 | 15,939,700 | 829% |
| 7/3/18 | 10,408,300 | 541% |
| TOTAL | 44,997,600 | 2,111% |

R-56.1 ¶¶ 20, 21, 24, 25, 28, 29, 32; McLaughlin Decl. Exhibit 11.

30. Table B sets out the number of New Concept securities *purportedly* traded during the Alleged Short Swing Period by all Interactive Brokers' customers in account No. 17, and those trades as a percentage of the Float:

| Table B: Interactive Brokers' Customers | | | | | | |
|---|---|---|---|---|---|---|
| Date | IB purchases | % of Float | IB sales* | % of Float | All IB trades (purchases + sales) | Trades as % of Float |
| 6/29 | 5,454,942 | 284% | 5,454,942 | 284% | 10,909,884 | 568% |
| 7/2 | 1,535,672 | 80% | 1,535,672 | 50% | 3,071,344 | 160% |
| 7/3 | 2,754,318 | 143% | 2,754,318 | 143% | 5,508,636 | 286% |
| TOTAL | 9,744,932 | 506.58 | 9,744,932 | 506.58% | 19,489,864 | 1014% |

*including "short sales"

R-56.1 ¶¶ 22, 23, 26, 27, 30, 31, 33; McLaughlin Decl. Exhibit 10.

31. Table C sets out the number of New Concept securities *purportedly* traded during the Alleged Short Swing Period by Mintbroker, and those trades as a percentage of the Float:

| Table C: Mintbroker | | | | | | |
|---|---|---|---|---|---|---|
| Date | Mintbroker purchases | % of Float | Mintbroker sales* | % of Float | Mintbroker total trades | Trades as % of Float |
| 6/29/18 | 1,804,833 | 93.82% | 780,348 | 40.57% | 2,585,181 | 134.39% |
| 7/2/18 | 0 | 0% | 113,576 | 5.90% | 113,576 | 5.9% |
| 7/3/18 | 37,106 | 1.93% | 997,243 | 51.84% | 1,034,349 | 53.77% |
| TOTAL | 1,841,939 | 95% | 1,891,167 | 98.31% | 3,733,106 | 194.06% |

*including "short sales"

R-56.1 ¶¶ 35, 36, 37, 38; McLaughlin Decl. Exhibit 12.

32. Table D sets out Plaintiff's assertions as to Defendants' trading activity set forth in its Rule 56.1 Statement of Facts (ECF Doc. No. 70), duplicated here with Defendants' responses (shaded rows B, C, V, B, I, and K) as to which of the material facts are

7

disputed (in red font). All of Defendants' figures are excerpted from McLaughlin Decl. Exhibit 12.

| Table D: Plaintiff v. Defendant Trade Calculations | | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| | Date | 6/29 | 7/2 | 7/3 |
| A | MintBroker Buys (Ex. H) | 1,804,833 | 0 | 0 |
| B | Mintbroker Opening Positions (D's Ex. 12) | 1,804,833 | 0 | 37,106 |
| C | MintBroker Sells (Ex. H) | 780,348 | 113,576 | 960,137 |
| D | Mintbroker Closing Positions – sell + short sell (D's Opp. Ex. 2) | 780,348 | 113,576 | 997,243 |
| E | MB position (end of day) <br><br>(% of GBR) | 1,024,485[2] <br><br>(48.05%) | 910,909 <br><br>(42.73%) | 0 <br><br>(0%) |
| F | Net opened positions minus closed positions (D's Opp. Ex. 2) | 1,024,485[3] <br><br>(48.05%) | 910,909[4] <br><br>(42.73%) | -48,150[5] <br><br>(0%) |

---

[2] While these "MB position (end of day) numbers in Row E are not disputed as to the way plaintiffs have calculated them (in other words, the arithmetic is correct), they are disputed because they are presented as a "net position", but do not reflect the actual net "position" of Mintbroker on any given trading day because they do not account for AWX share accumulation prior to 7/24. The Plaintiffs have calculated the MB position at the end of the day by adding the net "purchase minus sales" number to the prior day's end of day position. They have incorrectly assumed that Mintbroker started with zero Mintbroker shares on when in fact Mintbroker started trading in AWX shares on May 24, 2018. McLaughlin Decl. Exhibit 3.

[3] This number was calculated incorrectly in Defendants' Exhibit 12. Net purchases minus sales for 6/29 was 1,024,485 as set out in McLaughlin Opp. Decl. Exhibit 2.

[4] This number was calculated incorrectly in Defendants' Exhibit 12. Net purchases minus sales for 7/2 was 910,909 as set out in McLaughlin Opp. Decl. Exhibit 2.

[5] This number was calculated in error in Defendants' Exhibit 12. That figure, a net negative position compared to the day's opening balance stated as "-85,256" did not include the 37,106 purchases/open positions. The correct net position (open positions minus closed positions) including the 37,106 "purchases" based on an opening position of 910,909 on 7/3 is -48,150, as set out in McLaughlin Opp. Decl. Exhibit 2.

| H | GBR Trading Vol. (Ex. I) | 18,649,600 | 15,939,700 | 10,408,300 |
|---|---|---|---|---|
| I | | Not Disputed | Not Disputed | Not Disputed |
| J | Fails to Deliver (Ex. J) | 22,848 | 57,631 | 190,839 |
| K | | Not Disputed | Not Disputed | Not Disputed |

33. On June 29, Mintbroker opened a position in **1,804,833** shares representing **93.82**% of the Float and closed a position in **780,348** shares representing **40.57%** of the Float; its total trades were **2,585,181** "shares" representing **134.39%** of the Float. R-56.1 ¶ 34; McLaughlin Decl. Exhibit 12.

34. On July 2, Mintbroker closed a position in **113,576** shares representing **5.9%** of the Float. R-56.1 ¶ 35; McLaughlin Decl. Exhibit 12.

35. On July 3 Mintbroker opened a position in **37,106** shares representing **1.93**% of the Float and closed a position in **997,243** shares representing **51.84%** of the Float; its total trades were **1,034,349** "shares" representing **53.77%** of the Float. R-56.1 ¶ 36; McLaughlin Decl. Exhibit 12.

36. The combined trading in New Concept shares by Mintbroker during the Alleged Short Swing Period was **3,733,106** "shares", representing **194.06%** of the Float. Mintbroker's positive book entry position during the Alleged Short Swing Period was **1,841,939** "shares" and its negative book-entry position during the Alleged Short Swing Period representing sales and short sales was **1,891,167** " shares." R-56.1 ¶ 37; McLaughlin Decl. Exhibit 12.

37. Interactive Brokers informed its clients that "[e]ffective September 5, 2017, the standard settlement period for securities traded on U.S. and Canadian exchanges will be reduced from 3 business days (T+3) to 2 business days (T+2). McLaughlin Decl. Exhibit. 15.

38. "Most stock exchange transactions settle on the trade date plus two business days . . ." McLaughlin Declaration Exhibit 16 at p.11.

39. Mintbroker's Interactive Brokers 2018 Annual Statement features line items for starting cash, ending cash, and ending settled cash." R-56.1 ¶ 46; McLaughlin Declaration Exhibit 16 at pp. 1-2.

40. Mintbroker's Interactive Brokers Long Account Activity Statement, January 1, 2018- December 31, 2018 features line items for starting cash, ending cash, and ending settled cash. R-56.1 ¶ 47; McLaughlin Declaration Exhibit 17 at pp. 772-773.

41. The Interactive Brokers Long Account Activity Statement explains that "Ending settled cash reflects the cash that has actually settled." R-56.1 ¶ 48; McLaughlin Decl. Exhibit 17 at p. 5210.

42. The Interactive Brokers code "SS" indicates that a customer has "designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market." R-56.1 ¶ 49; McLaughlin Decl. Exhibit 17 at p. 5210.

43. None of Mintbroker's GBR long trades were designated "SS." R-56.1 ¶ 50; McLaughlin Decl. Exhibit 17 at pp. 1150-1202.

44. None of Mintbroker's GBR short trades were designated "SS." R-56.1 ¶ 51; McLaughlin Decl. Exhibit 18 at pp. 431-433.

45. None of the Interactive Brokers' trades in New Concept Securities (which include all of Defendants' trades) made on June 29, 2018, settled until July 3, 2018. Defendants' R56.1 Statement at ¶ 52; McLaughlin Decl. Exhibit. 10.

46. None of the Interactive Brokers' trades in New Concept Securities (which include all of Defendants' trades) made on July 2, 2018 settled until July 5, 2018.   R56.1 Statement at ¶ 53; McLaughlin Decl. Exhibit. 10.

47. None of the Interactive Brokers' trades in New Concept Securities (which include all of Defendants' trades) made on July 3, 2018 settled until July 6, 2018.  R56.1 Statement at ¶ 54; McLaughlin Decl. Exhibit. 10.

48. Publicly Available SEC "fail to deliver" data identifies only the settlement date, security, quantity, and price of a failed trade.  It does not state whether it is a purchase or sale, or the time of the transaction, and it does not identify the trade date, or the purported purchaser, seller, or broker. Declaration of Danielle M. McLaughlin in Support of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("McLaughlin Opp. Decl.") Exhibit 1-b.

49. "The values of total fails-to-deliver shares represent the aggregate net balance of shares that failed to be delivered as of a particular settlement date . . . . Fails to deliver on a given day are a cumulative number of all fails outstanding until that day, plus new fails that occur that day, less fails that settle that day. The figure is not a daily amount of fails, but a combined figure that includes both new fails on the reporting day as well as existing fails. In other words, these numbers reflect aggregate fails as of a specific point in time, and may have little or no relationship to yesterday's aggregate fails. Thus, it is important to note that the age of fails cannot be determined by looking at these numbers. In addition, the underlying source(s) of the fails-to-deliver shares is not necessarily the same as the underlying source(s) of the fails-to-deliver shares reported the day prior or the day after".  McLaughlin Opp. Decl. Exhibit 1-a at p. 1.

50. According to Interactive Brokers, a customer may, "generally speaking," have voting power in securities, but only to the extent they have a long position in the securities. R-56.1 ¶ 63; McLaughlin Decl. Exhibit. 19 at 114:24-125:6.

51. A short seller never has any voting rights because it never takes possession of any shares. R-56.1 ¶ 64; McLaughlin Decl. Exhibit 9 at pp. 12-18 to 12-20.

52. The Interactive Brokers 30b(6) deponent in this matter did not know if a customer could vote shares after an order had been placed but before the shares were placed into the customer's account. R-56.1 ¶ 65; McLaughlin Decl. Exhibit 19 at 170:18-171:8.

53. This deponent did not establish that the contract between Interactive Brokers and Mintbroker enabled Mintbroker to provide voting instructions to Interactive Brokers, and nor did he establish that Mintbroker exercised any voting power during the period that it held a position in New Concept securities. R-56.1 ¶ 66.

54. "Fifty years ago investing was a distinctly human affair. "People would have to take each other out, and dealers would entertain fund managers, and no one would know what the prices were," says Ray Dalio, who worked on the trading floor of the New York Stock Exchange (NYSE) in the early 1970s before founding Bridgewater Associates, now the world's largest hedge fund. Technology was basic. Kenneth Jacobs, the boss of Lazard, an investment bank, remembers using a pocket calculator to analyze figures gleaned from company reports. His older colleagues used slide rules. Even by the 1980s "reading the *Wall Street Journal* on your way into work, a television on the trading floor and a ticker tape" offered a significant information advantage, recalls one investor." McLaughlin Opp. Decl. Exhibit 1-c at p. 1.

55. "Each day around 7bn shares worth $320bn change hands on America's stock market. Much of that volume is high-frequency trading, in which stocks are flipped at speed in order to capture fleeting gains. High-frequency traders, acting as middlemen, are involved in half of the daily trading volumes. Even excluding traders, though, and looking just at investors, rules-based investors now make the majority of trades." McLaughlin Opp. Decl. Exhibit 1-c at p. 1.

Dated: September 23, 2020
New York, NY