**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW CONCEPT ENERGY, INC. | |
| Plaintiff, | No. 18-cv-8896 (VSB) (RJL) |
| v. | ECF Case |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |

Related to:

| | |
|---|---|
| AVALON HOLDINGS CORP., | |
| Plaintiff, | No. 18-cv-7291 (VSB) (RJL) |
| v. | ECF Case |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | |
| Defendants. | |

**PLAINTIFF'S RESPONSES TO**
**DEFENDANTS' L.R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 4.F of the Court's Individual Rules of Practice, Plaintiff submits

these responses to Defendants' L.R. 56.1 Statement of Undisputed Material Facts. Defendants'

numbered Statements are reproduced

1. New Concept Energy, Inc. ("New Concept") is a Dallas, Texas-based oil and gas drilling and exploration company. Declaration of Danielle M. McLaughlin in Support of Defendants' Motion for Summary Judgment ("McLaughlin Decl."), Exhibit 1.

**Response:** Not disputed.

1

2.      For the first six months of 2018, up until June 29, 2018, New Concept's share price ranged from approximately $1.26. to $1.89. McLaughlin Decl. Exhibit 2.

**Response:**      Not disputed.

3.      On May 24, 2018, Mintbroker, International, Ltd. ("Mintbroker") through Interactive Brokers, opened a position in New Concept securities with the purchase of 100 shares. McLaughlin Decl. Exhibit 3.

**Response:**

MintBroker's Interactive Account Statements, which were stipulated as accurate for the purposes of these Motions for Summary Judgment (*see* Pl. Ex. B),[1] and which were authenticated by Interactive's R.30(b)(6) witness, are attached as Ex. D. & Ex. E to Plaintiff's Motion. The transactions reflected on the Interactive statements for MintBroker's two trading "subaccounts" (UL#1043811 and US#1043812) are aggregated and sorted in chronological order at Ex. H to Plaintiff's Motion. The Account Statements reflect that MintBroker's first trade was a purchase of 500 shares at a price of $1.38 per share, on May 24, 2018, at 10:07:21 AM (*see* Pl. Ex. H, *see also* Pl. Ex. D & E.) The document attached at Defendants' Ex. 3 and referenced in this Paragraph appears to be an excerpt from the document introduced as Ex. #22 at the deposition of Interactive Brokers' R. 30(b)(6) witness. As Interactive's witness testified, this exhibit includes shares traded by all Interactive customers (not just the Defendants). With respect to the Defendants' trades, Defendants' Ex. 3 represents the "individual executions that made up [an] aggregate transaction" indicated on the Account Statements (Interactive Dep. at 45:10-12). For example, on June 15, 2018, MintBroker's purchase of 500 shares was in fact made up of several "partial fills" adding up to 500 shares, and MintBroker was given a "weighted average" price for the 500 shares purchased.

---

[1] Citations to "Pl. Ex. __" reference the Exhibits attached to the Affidavit of Miriam Tauber, which accompanied Plaintiff's Motion for Summary Judgment (*see* Dkt #

4.      On September 25, 2018, Mintbroker closed its position in New Concept securities with the sale of 1500 shares. McLaughlin Decl. Exhibit 4.

**Response:**

The Account Statements referenced in the Stipulation (Ex __ and Ex __), as organized at Ex. __, reflect that MintBroker "netted its position in New Concept securities to zero with the sale of" 100 shares at a price of $3.88 per share on July 10, 2018, at 9:57:35 AM. (*See* Ex. H, at p.35, row 1,562). MintBroker continued to trade GBR shares (at least) until September 24, 2018, but according to the Account Statements, MintBroker did not cross over the 10% "beneficial ownership" threshold between July 10, 2018 and the end of 2018. Defendants' Ex. 4, like Defendants' Ex. 3, is an excerpt from the same "trade blotter" document introduced as Interactive Deposition Ex. #22. Plaintiff refers to the discussion of this document in Response to Defendants' Paragraph 3.

5.      For approximately the last six months of 2018, after July 3, 2018, New Concept's closing share price ranged from approximately $4.95 to $1.40, with the closing share price sitting above $2.00 from July 30, 2018 until approximately December 14, 2019. McLaughlin Decl. Exhibit 2.

**Response:**      Not disputed.

6.      The highest closing share price of $4.95 in the second half of 2018 represents a 161% increase over the highest closing share price of $1.89 in the first half of 2018, and the lowest closing share price of $1.40 in the second half of 2018 represents a 17.6% increase over the lowest closing price of $1.26 in the first half of 2018. McLaughlin Decl. Exhibit 2 and ¶ 4.

**Response:**      Not disputed.

7.      Between its opening and closing positions, Mintbroker undertook some 15,911 trades in purported New Concept securities. McLaughlin Decl. ¶ 6.

**Response:**

As indicated in the above Response to Paragraph 4, the Account Statements aggregated at Ex. H reflect that MintBroker executed 1,559 transactions between the "opening"

trade on May 24, 2018 (Ex. H, at row 3) and the trade on July 10, 2018 referenced at Paragraph 4.

8.    On June 29, 2018, Defendant Mintbroker filed a SEC Form 3 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating that it had taken a position in 1,073,713 shares of New Concept Energy, Inc. McLaughlin Decl. Exhibit 5.

**Response**:    Not disputed.

9.    On July 3, 2018, Mintbroker filed a SEC Form 4 pursuant to Section 16(a) of the Securities Exchange Act of 1934 stating it had decreased its position in New Concept securities by 114,576 shares to 959,137 shares. McLaughlin Decl. Exhibit 6.

**Response**:

Not disputed. MintBroker filed SEC Form 4 "Statement of Changes in Beneficial Ownership" reports, which are required by Section 16(a) of the Act, on July 5, 2018 (reporting a sale of 959,137 shares of GBR common stock).

10.    On September 17, 2018, Mintbroker filed a SEC Form13-D pursuant to Section 16(a) of the Securities Exchange Act of 1934, to which it attached all of its trading records reflecting positions in New Concept stock effected during the prior sixty days by Mintbroker. Gentile, by virtue of his relationship to MintBroker, noted in this form that he "may be deemed to indirectly beneficially own (as that term is defined in Rule 13d-3 under the Exchange Act of 1934, as amended) those Shares which MintBroker had owned" and that he "disclaim[ed] beneficial ownership of all such Shares for all other purposes." McLaughlin Decl. Exhibit 7.

**Response:**

MintBroker's Schedule 13D, which is the "beneficial ownership" report required under Section 13(d) of the Act, was filed with respect to New Concept on September 17, 2018. The Schedule 13D is attached to Plaintiff's Motion as Ex. F. While the text of the Schedule 13D speaks for itself, Plaintiff notes that Defendants' statement of their interpretation of the law does not establish the accuracy of that interpretation, and facts asserted in Defendants' Schedule 13D constitute hearsay unless otherwise established. Gentile testified that he believed the trading

activity reported on his Schedule 13D was compiled from the trading records produced by the Defendants in discovery and attached as Ex. G to Plaintiff's Motion. Gentile also testified, and the parties have stipulated, that these trading records reflect or otherwise correspond to AWX trades executed through Defendants' Interactive trading accounts, as reflected on the Account Statements attached as Ex. D &E to Plaintiff's Motion, and as further discussed in the Responses to Paragraphs 3 and 4, above.

11.     The period during which Defendants purported to hold more than 10% of the outstanding common stock of New Concept is June 29, 2018 at 10:05 a.m. until July 3, 2018 at 9:38 a.m., comprising three trading days: June 29, July 2, and July 3 (excluding June 30 and July 1, a weekend) (the "Alleged Short Swing Period"). McLaughlin Decl. ¶ 11.

**Response**:

Based on the Interactive Account Statements as summarized on Ex. H, MintBroker was a more-than 10% "beneficial owner" of GBR common stock at all times from June 29, 2018 at 10:05:36 AM through July 3, 2018 at 9:38:17 AM (Pl. Ex. H, at rows 217 - 1,432).

12.     Defendants made 13,067 trades during the Short Swing Period. McLaughlin Decl. ¶ 12.

**Response:**

There are 1,215 total transactions (i.e., total number of rows of Pl. Ex. H) reflected on the Account Statements as executed by MintBroker while a beneficial owner of more than 10% of outstanding AWX common stock (i.e., during the time periods identified in the Response to Paragraph 11). The transactions reflected on the Interactive Account Statements may have been executed by Interactive in one or more transactions or "partial fills," as discussed in the Response to Paragraph 3.

13.      Defendants made 169 short sales during the Alleged Short Swing Period, for a total of 18,253 "shares." McLaughlin Decl. ¶ 13.

**Response:**

The sales executed through Defendants' "short account" (Pl. Ex. E) are identified as such on the list of transactions Pl. Ex. H ("source" column).

14.      Based upon the trading records produced by Interactive Brokers (that do not account for settlement dates), Defendants' maximum position was 53% of the New Concept outstanding stock on June 29, 2018 at 1:07 p.m. McLaughlin Decl. ¶ 14.

**Response:**      Not disputed.

15.      The number of New Concept shares outstanding "through June 23, 2018" was 2,131,934. McLaughlin Decl. Exhibit 8.

**Response:**

At all relevant times, there were 2,131,935 shares of GBR outstanding. (New Concept 10Q/A filed May 15, 2018.)

16.      A company's share register sets forth the legal owners of that company's stock. McLaughlin Decl. Exhibit 9, at 12-5. These "registered owners" or "record owners" (the "record date" is the date upon which they legally own the shares) generally possess share certificates that "represent their ownership in the company." Id. The vast majority of publicly traded shares in the United States are registered in the name of Cede & Co., the nominee of The Depository Trust Company ("DTC"). Id. at 12-3. DTC is the largest "legal" owner of most public companies' stock. Id. at 12-5. "Shares registered in this manner are commonly referred to as being held in "street name." Id. "The street name registration system was created to facilitate securities trading, eliminate paperwork and preserve the confidentiality of beneficial owners' identities." Id. "Beneficial owners are divested of the rights incident to legal ownership when they hold their shares in street name." Id.

**Response:**

The registrar identifies the "record owners" of the Company's common stock. Brokerage customers are the "beneficial owners" of shares held in their brokerage accounts for all

purposes relevant to Section 16. Plaintiff does not dispute that shares held in brokerage accounts are typically registered in the name of Cede & Co., which is commonly referred to as held in "street name." Customers holding their shares in "street name" are not "divested" of any rights of beneficial ownership, including the right to vote their shares, which is governed by SEC regulations governing proxy voting.

17.   Transactions involving street name shares are conducted using DTC's electronic "book-entry" system of accounting for share transfers. McLaughlin Decl. Exhibit 9 at 12-6. When one participant's client sells shares in a particular company, that participant's DTC account is debited and the purchasing participant's account is credited by the same amount. Id. DTC's "book-entry" system negates the need to keep a large inventory of physical stock certificates.  The shares of each company held by DTC are typically represented by only one or more immobilized jumbo stock certificates held in DTC's vault. Id.

**<u>Response</u>:**

Plaintiff does not dispute the generalized description of the DTC "book entry" system in the referenced Defendants' Ex. 9.

18.   New Concept shares are DTC eligible securities, as evidenced by the DTC settlement data produced in this litigation. McLaughlin Decl. Exhibit. 10.

**<u>Response</u>:**

Plaintiff does not dispute the DTC data with respect to New Concept trading introduced at Defendants' Ex. 10.

19.   The number of New Concept shares owned by "Cede & Co." "through June 23, 2018" and available for street-side trading was 1,923,676 (the "Float). McLaughlin Decl. ¶ 17.

**<u>Response</u>:**

Plaintiff does not dispute that the registrar document attached at Def. Ex. 8 purports to indicate 3,250,012 shares registered in the name of "Cede & Co."

20.   On June 29, 2018, 18,649,600 New Concept shares were traded by all

market participants. McLaughlin Decl. Exhibit 11.

**Response:**        Not disputed.

21.        The June 29, 2018 trading by all market participants in New Concept Shares represented 969% of the Float. McLaughlin Decl. ¶ 23.

**Response:**

Not disputed, except as to the use of the "Float" as defined by the Defendants, rather than the number of outstanding shares, as the relevant benchmark.

22.        On June 29, 2018, 5,454,942 New Concept shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of 10,909,884 trades. McLaughlin Decl. Exhibit. 10.

**Response:**        Not disputed.

23.        The June 29, 2018 trading by Interactive Brokers customers represented 568% of the Float. McLaughlin Decl. ¶ 27.

**Response:**        Not disputed (other than as stated above with respect to the "Float").

24.        On July 2, 2018, 15,939,700 New Concept shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

**Response:**        Not disputed.

25.        The July 2, 2018 trading by all market participants in New Concept Shares represented 829% of the Float. McLaughlin Decl. ¶ 24.

**Response:**        Not disputed (other than as stated above with respect to the "Float").

26.        On July 2, 2018, 1,535,672 New Concept shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of 3,071,344 trades. McLaughlin Decl. Exhibit 10.

**Response:**        Not disputed.

27.        The July 2, 2018 trading by Interactive Brokers customers represented 160% of the Float. McLaughlin Decl. Exhibit ¶ 28.

**Response:**        Not disputed (other than as stated above with respect to the "Float").

28.     On July 3, 2018, 10,408,300 New Concept shares were traded by all market participants. McLaughlin Decl. Exhibit 11.

**Response:**     Not disputed.

29.     The July 3, 2018 trading in New Concept Shares represented 541% of the Float. McLaughlin Decl. Exhibit ¶ 25.

**Response:**     Not disputed (other than as stated above with respect to the "Float").

30.     On July 3, 2018, 2,754,318 New Concept shares were purchased and sold by Interactive Brokers' customers, including Defendants, for a total of 5,508,636 trades. McLaughlin Decl. Exhibit 10.

**Response:**     Not disputed.

31.     The July 3, 2018 trading by Interactive Brokers customers represented 286% of the Float. McLaughlin Decl. ¶ 29.

**Response:**     Not disputed (other than as stated above with respect to the "Float").

32.     The combined trading in New Concept shares by all market participants during the Alleged Short Swing Period was 44,997,600 shares, representing 2,111% of the Float. McLaughlin Decl. Exhibits ¶¶ 22, 26.

**Response:**     Not disputed (other than as stated above with respect to the "Float").

33.     The combined trading in New Concept shares by Interactive Brokers' customers during the Alleged Short Swing Period was 19,489,864 shares, representing 1014% of the Float. McLaughlin Decl. Exhibit 10.

**Response:**     Not disputed (other than as stated above with respect to the "Float").

34.     On June 29, Mintbroker opened a position in 1,804,833 shares representing 93.82% of the Float and closed a position in 780,348 shares representing 40.57% of the Float; its total trades were 2,585,181 "shares" representing 134.39% of the Float. McLaughlin Decl. Exhibit 12.

**Response:**     Not disputed (other than as stated above with respect to the "Float").

35.     On July 2, Mintbroker closed a position in 113,576 shares representing 5.9% of the Float. McLaughlin Decl. Exhibit 12.

**Response:**     Not disputed (other than as stated above with respect to the "Float").

36.    On July 3 Mintbroker opened a position in 37,106 shares representing 1.93% of the Float and closed a position in 997,243 shares representing 51.84% of the Float; its total trades were 1,034,349 "shares" representing 53.77% of the Float. McLaughlin Decl. Exhibit 12.

**Response:**    Not disputed (other than as stated above with respect to the "Float").

37.    The combined trading in New Concept shares by Mintbroker during the Alleged Short Swing Period was 3,733,106 "shares", representing 194.06% of the Float. Mintbroker's positive book entry position during the Alleged Short Swing Period was 1,841,939 "shares" and its negative book-entry position during the Alleged Short Swing Period representing sales and short sales was 1,891,167 "shares." McLaughlin Decl. Exhibit 12.

**Response:**    Not disputed (other than as stated above with respect to the "Float").

38.    Account #I1043365 was a proprietary trading account held by MintBroker at Interactive Brokers ("Interactive") and it served as the "Master Account" for two proprietary sub- accounts: (i)Account #UL1043811; and (ii) Account #US1043812 (the "Trading Accounts"). McLaughlin Decl. Exhibit 13.

**Response:**    Not disputed.

39.    The "Activity Statements" produced by Interactive for each of the Trading Accounts accurately reflect the Avalon (AWX) and New Concept (GBR) trades executed in those Trading Accounts by Gentile, as the sole owner of MintBroker. (See #UL1043811 "Activity Statement" (filename: Annual Statements/MINT 2018 UL.pdf), AWX trades at pp.933 –1000; GBR trades at pp.1150 –1202; see also #US1043812 "Activity Statement" (filename: Annual Statements/MINT 2018 US.pdf), AWX trades at pp.203-206; GBR trades at pp. 431-433). McLaughlin Decl. Exhibit 13.

**Response:**    Not disputed.

40.    The trades reflected in the Activity Statements for the Trading Accounts include the Avalon and New Concept trades reflected in the records produced by the Defendants at Bates Numbers MINT-AWX000001-140 and MINT-GBR-000001-159. McLaughlin Decl. Exhibit 13.

**Response:**    Not disputed.

41.    Cash was credited or debited to the Trading Accounts, as applicable, in connection with each AWX or GBR trade listed on the "Activity Statements," in the amount of the "Proceeds" indicated on the "Activity Statements" for each such trade. McLaughlin Decl. Exhibit 13.

**Response:**     Not disputed.

42.     On May 22, 2017, the SEC amended Rule 15c6-1(a) to shorted by one business day the standard settlement cycle for broker-dealer securities transactions from trade date plus 3 business days ("T+3") to trade date plus 2 business days, known as T+2. McLaughlin Decl. Exhibit 14.

**Response:**     Not disputed.

43.     "Generally, this change would mean that when an investor buys a security, the brokerage firm must receive payment from the investor no later than two business days after the trade is executed. When an investor sells a security, the investor must deliver to the brokerage firm the investor's security no later than two business days after the sale. For example, if an investor sells shares of a particular stock on Monday, the transaction would settle on Wednesday." McLaughlin Decl. Exhibit 14.

**Response:**     Not disputed.

44.     Interactive Brokers informed its clients that "[e]ffective September 5, 2017, the standard settlement period for securities traded on U.S. and Canadian exchanges will be reduced from 3 business days (T+3) to 2 business days (T+2). McLaughlin Decl. Exhibit. 15.

**Response:**     Not disputed.

45.     "Most stock exchange transactions settle on the trade date plus two business days . . ." McLaughlin Declaration Exhibit 16 at p.11.

**Response:**     Not disputed.

46.     Mintbroker's Interactive Brokers 2018 Annual Statement features line items for starting cash, ending cash, and ending settled cash." McLaughlin Declaration Exhibit 16 at pp. 1-2.

**Response:**     Not disputed.

47.     Mintbroker's Interactive Brokers Long Account Activity Statement, January 1, 2018- December 31, 2018 features line items for starting cash, ending cash, and ending settled cash. McLaughlin Declaration Exhibit 17 at pp. 772-773.

**Response:**     Not disputed.

48.     The Interactive Brokers Long Account Activity Statement explains that "Ending settled cash reflects the cash that has actually settled." McLaughlin Decl. Exhibit 17 at p. 5210.

**Response:**     Not disputed.

49.     The Interactive Brokers code "SS" indicates that a customer has "designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market." McLaughlin Decl. Exhibit 17 at p. 5210.

**Response:**     Not disputed.

50.     None of Mintbroker's GBR long trades were designated "SS." McLaughlin Decl. Exhibit 17 at pp. 1150-1202.

**Response:**     Not disputed.

51.     None of Mintbroker's GBR short trades were designated "SS." McLaughlin Decl. Exhibit 18 at pp. 431-433.

**Response:**     Not disputed.

52.     None of the Interactive Brokers' trades in New Concept Securities (which include all of Defendants' trades) made on June 29, 2018, settled until July 3, 2018. McLaughlin Decl. Exhibit. 10.

**Response:**     Not disputed.

53.     None of the Interactive Brokers' trades in New Concept Securities (which include all of Defendants' trades) made on July 2, 2018 settled until July 5, 2018. McLaughlin Decl. Exhibit. 10.

**Response:**     Not disputed.

54.     None of the Interactive Brokers' trades in New Concept Securities (which include all of Defendants' trades) made on July 3, 2018 settled until July 6, 2018. McLaughlin Decl. Exhibit. 10.

**Response:**     Not disputed.

55.     The number of shares available for a short seller to borrow is necessarily less than the number of shares in the float of a given stock. McLaughlin Decl. Ex. 19 at 162:2-15.

**Response**:

      Plaintiff refers to the SEC's "Key Points About Regulation SHO," appended as Pl. Ex. O, for an explanation of "short selling" rules and practices relevant to this case, including the procedures required in the event of excessive short selling.

56.     For example, if on a given day, market participants are looking to borrow shares to short sell five million shares, but only one million shares exist, only one million shares can be obtained and are available for delivery on that day. McLaughlin Decl. Exhibit. 19 at 162:16-25.

**Response**:

      Plaintiff refers to the SEC's "Key Points About Regulation SHO," appended as Pl. Ex. O, for an explanation of "short selling" rules and practices relevant to this case, including the procedures required in the event of excessive short selling.

57.     Multiple brokers can short the same finite "pot" of shares on any given trading day, meaning there might be one million shares available, but two million shares to be sold short. Over the next two trading days, the "clearing function" means the shorted shares will either be delivered or available to borrow, or the short will be closed out because the shares are unavailable. McLaughlin Decl. Exhibit. 19, at 99:15-100:19

**Response**:

      Plaintiff refers to the SEC's "Key Points About Regulation SHO," appended as Pl. Ex. O, for an explanation of "short selling" rules and practices relevant to this case, including the procedures required in the event of excessive short selling.

58.     When an Interactive Brokers customer puts an order for shares to be filled, Interactive Brokers routes the order to an exchange and then it is filled on the exchange by a counterparty. McLaughlin Decl. Exhibit. 19 at 154:12-155:6.

**Response**:

      Plaintiff does not dispute that Interactive routes customer trade orders to one of several possible national securities exchanges for execution. These trades are "filled" by

Interactive, as the customer's broker, and executed against an unknown market participant who is the counterparty to the trade.

59.    Interactive Brokers does not know whether or not the counterparty, if not also an Interactive Brokers customer, actually owns the shares it purports to be selling. McLaughlin Decl. Exhibit. 19 at 155:4-11.

**Response:**

Plaintiff does not dispute that when Interactive executes a buy order for a customer, Interactive does not know if the selling counterparty is a short seller.

60.    Interactive Brokers does not place any securities into its customer's account until the trade has settled. McLaughlin Decl. Exhibit 19 at 167:22-168:8.

**Response:**

Plaintiff does not dispute that there is generally a delay between trade execution and trade settlement.

61.    Voting power is a legal incident to share ownership, which is vested in the legal owner of stock, which include registered owners, who appear in the company's share registry, and DTCC, which registers the shares it owns under "Cede & Co." McLaughlin Decl. Exhibit 9 at p. 12-6. Only Legal owners can vote shares, while street name holders are not "technically entitled to vote shares or grant proxy authority." *Id*. at p. 12-7. However, DTC assigns to each market participant (including Interactive Brokers) the voting rights associated with particular shares in that participant's DTC account "as of the record date." *Id*. at p. 12-7. The "record date" is the date that a shareholder obtains legal ownership. *Id*. at p. 12-5. Absent special circumstances, proxy authority is never transferred down to the ultimate beneficial owners. *Id*. at pp. 12-7 to 12-8.

**Response:**

Plaintiff refers to the above responses regarding the relevance of "record ownership" as opposed to "beneficial ownership," which is the concept relevant to this case. Brokerage customers are the "beneficial owners" of shares held in their accounts, regardless of whether the shares are held in "street name."

14

62.　　In order to vote shares, the customers of market participants may, by contract with the market participant, have the right to provide voting instructions to their bank or broker, who, in turn, has the legal right to actually vote those shares. *Id*. at pp. 12-7 to 12-8.

**Response**:

Brokerage customers, who are the "beneficial owners" of shares held in their accounts, are entitled to vote their shares. Under the SEC's proxy regulations, brokers holding their customer shares in "street name" are required to provide the customers with the opportunity to vote their shares (including by requesting a transfer of "record ownership").

63.　　According to Interactive Brokers, a customer may, "generally speaking," have voting power in securities, but only to the extent they have a long position. McLaughlin Decl. Exhibit 19 at 114:24-125:6.

**Response**:　　Not disputed.

64.　　A short seller never has any voting rights because it never takes possession of any shares. McLaughlin Decl. Exhibit 9 at pp. 12-18 to 12-20.

**Response**:

Regardless of whether short sellers have voting rights with respect to the shares sold short, the purchasers of shares from short sellers acquire the right to vote—and the right to sell—the shares owed by the short sellers. Additionally, short sellers, like all traders, have a "pecuniary interest" in the shares they trade—including any shares sold short. "Possession" is not an element of "beneficial ownership" relevant to Section 16.

65.　　The Interactive Brokers 30b(6) deponent in this matter did not know if a customer could vote shares after an order had been placed but before the shares were placed into the customer's account. McLaughlin Decl. Exhibit 19 at 170:18-117:8.

**Response**:　　Not disputed.

66.　　This deponent did not establish that the contract between Interactive Brokers and Mintbroker enabled Mintbroker to provide voting instructions to Interactive Brokers, and nor did he establish that Mintbroker exercised

any voting power during the period that it held a position in Avalon securities.

**Response**:

As Interactive's deponent testified, the voting rights provided to brokerage customers are governed by the SEC's proxy voting regulations.

67. Counsel for New Concept, David Lopez, has brought at least 325 Section 16(b)-related cases in the Southern District of New York since 1973. McLaughlin Decl. Exhibit 20, PACER Search results for "attorney" Firstname "David" Lastname "Lopez.

**Response**:

Not disputed. Plaintiff refers the Court to the supplement filed in connection with Plaintiff's opposition to Defendants' Motion to Dismiss (Dkt #32-1) regarding Defendants' unprofessional (and baseless) accusations and attempts to denigrate the value of Plaintiff's counsel's Section 16 enforcement efforts.

68. Counsel for New Concept, Miriam Tauber, has brought some 45 Section 16(b)-related cases in the Southern District of New York since 2014. McLaughlin Decl. Exhibit 21.

**Response**:       See Response to above Paragraph 67.

69. Lopez and/or Tauber have represented Plaintiff Deborah Donoghue in at least 146 16(b)-related demand action 146 times since 2001.  McLaughlin Decl. Exhibit 22.

**Response**:       See Response to above Paragraph 67.

70. Lopez represented Plaintiff Richard Morales in approximately 88 16(b)-related demand action 146 times prior to 2001. McLaughlin Decl. Exhibit 23.

**Response**:       See Response to above Paragraph 67.

71. Plaintiff Deborah Donoghue was substituted for Plaintiff Richard Morales or designated as plaintiff/executrix of Richard Morales in eight cases in 2001 after he died:

a) *Donoghue, et al v. Flightserv.Com, et al.*, No. 1:00-cv-03987-JSM
b) *Donoghue, et al v. Miracor Diagnostics, et al.*, No. 1:00-cv-06696-JGK
c) *Morales, et* al *v. Natural Microsystems, et al*., No. 1:01-cv-00708-RWS
d) *Morales, et al v. CT Holdings Inc., et al*., No. 1:01-cv-01303-KMW-KNF
e) *Donoguhe v. Integrated Business, et al.*, No. 1:01-cv-02407-KMW
f) *Donoghue v. Opti, Inc., et al.*, No. 1:01-cv-02447-MP
g) *Donoghue v. Equitex, Inc., et al.*, No. 1:01-cv-06132-WK
h) *Donoghue v. Spatializer Audio, et al.*, No. 1:01-cv-07286-AKH

McLaughlin Decl. Exhibit 22.

**Response:**       See Response to above Paragraph 67.

72.     Lopez has represented Plaintiff C.R.A. Realty Corp. in approximately 50 16(b)- related cases. McLaughlin Decl. Exhibit 24.

**Response:**       See Response to above Paragraph 67.

73.     Lopez and/or Tauber have represented Plaintiff Aaron Rubenstein in approximately 24 16(b)-related demand actions since 2015. McLaughlin Decl. Exhibit 25.

**Response:**       See Response to above Paragraph 67.

74.     Lopez and/or Tauber have represented Plaintiff Mark Rubenstein in approximately 10 16(b)-related demand actions since 2015. McLaughlin Decl. Exhibit 26.

**Response:**       See Response to above Paragraph 67.

75.     A great number of this cohort's 16(b) cases are dismissed within months of being brought, including, for example, as to Richard Morales, the following cases: *Morales v. Underwriters Group, et al.*, No 1:93-cv-06228-LAP (filed 9/7/1993, closed 11/17/1993); *Morales v. IEC Electronics, et al*., No 1:00-cv-017553-BSJ, (filed 3/7/00, closed 7/29/00; *Morales v. Coleman Co. In., et al*., No. 1:00-cv-02482-VM (filed 3/31/11, closed 5/1/00); *Morales v. Memberworks Inc., et al*., No. 1:00-c- 03122-JSM (filed 4/24/00, closed 8/28/00); *Morales v. Zale Corporation, et al.*, No. 1:95:cv-01653 (filed 3/10/95, closed 4/19/95). McLaughlin Decl. Exhibit 23.

**Response:**       See Response to above Paragraph 67.

76.     Following the filing of *Huppe v. Special Solutions Fund III QP, L.P*. in 2006 and six years of litigation thereafter, Ayro informed shareholders in its 2013 Annual Report that a settlement reached against alleged short-swing shareholders in the case constituted $529,280 in disgorgement of short-

swing profits, less the fees and expenses agreed upon by the plaintiffs of $272,539, leaving a remainder of $254,361 for Ayro which would be "recorded as additional paid-in capital." McLaughlin Decl. Exhibit 29.

**Response:**     See Response to above Paragraph 67.


Dated: September 23, 2020
     New York, NY

*s/ Miriam Tauber*                                  *s/ David Lopez*

_____          _____
Miriam Tauber (MT-1979)                    David Lopez (DL-6779)
MIRIAM TAUBER LAW PLLC                     LAW OFFICES OF DAVID LOPEZ
885 Park Ave. 2A                           PO Box 323 | 171 Edge of Woods Rd.
New York NY 10075                          Southampton NY 11969
323-790-4881                               (631) 287-5520
MiriamTauberLaw@gmail.com

*Attorneys for Plaintiff New Concept Energy, Inc.*