UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x

NEW CONCEPT ENERGY, INC.,

                *Plaintiff*,           Case No.: 18-cv-8896-VSB-RWL

      – against –

GUY GENTILE AND MINTBROKER INTERNATIONAL, LTD.,

                *Defendants*

-----------------------------------------------------------------------------x

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

                FORD O'BRIEN LLP

                Adam C. Ford
                Robert S. Landy
                Danielle M. McLaughlin
                575 Fifth Avenue
                17th Floor
                New York, New York 10017
                aford@fordobrien.com
                rlandy@fordobrien.com
                dmclaughlin@fordobrien.com
                (212) 265-1047

                *Attorneys for Defendants Guy Gentile*
                *and Mintbroker International, Ltd.*

October 5, 2020

Pursuant to Fed. R. Civ. P. 56 and the Local Rules of the United States District Court for the Southern District of New York, Defendants Guy Gentile and Mintbroker International, Ltd. ("Mintbroker"), by their undersigned counsel, submit this Reply Brief in Support of their Motion for Summary Judgment (ECF Doc. No. 64).

## INTRODUCTION

Unable to account for the specific material facts and circumstances of this case – including massive trading volume representing many multiples of the available New Concept shares at any one time, the Securities and Exchange Commission's mandated settlement period, and the impact of naked short sellers on Defendants' (and others') ability to actually purchase or become "beneficial owners" of New Concept "securities" – Plaintiff simply argues past Defendants in its Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Further Support to its Motion for Summary Judgment, ECF Doc. No. 79 ("Pl. Opp."). Rather than acknowledging and confronting the factual shortcomings in its case (which preclude a finding of liability under Section 16(b) case law as it stands), Plaintiff robotically argues that the facts here meet all definitional standards of the statutory and regulatory scheme of the 1934 Securities Exchange Act and strict liability necessarily applies. The evidence proves otherwise.

Even if this court does not grant Defendants' own motion for summary judgment and dismiss this case, at the very least there is a dispute of material fact as to whether Defendants were trading in actual securities, or whether their trades were in book entries simply tied to the New Concept share price. There is also a dispute of material fact as to whether Defendants came into possession of any New Concept shares at all, because their "purchases" did not clear or settle until after they had entirely exited their position in New Concept stock. And while Plaintiff urges this court not to consider policy when making a determination on summary

1

judgment (a "tell" that illuminates the flaws in its case), policy counsels that the trading activity here is not the speculative abuse, borne of inside knowledge, that Section 16(b) was designed to deter and punish, and as such it falls outside Section 16(b)'s necessarily narrow construction.

## **ARGUMENT**

I.   Section 16(b) Of The 1934 Securities Exchange Act Does Not Apply Here

   A.   Defendants Did Not Purchase, or Sell, "Securities"

As the Court is well aware, SEC Rule 16a–1(a) provides that, in determining whether an individual is a "beneficial owner" under § 16(b) of the Act, courts should look to Section 13(d), 17 CFR 240.13d-3(a), which states that a beneficial ownership can be established by "voting power," or by "investment power," which "includes the power to dispose, or to direct the disposition of, *such security*." (Emphasis added).  Plaintiff admits Defendants never possessed voting power with respect to even a single share.  Despite this admission, Plaintiff argues that it has established "the more easily identified possession of 'dispositive' power, i.e., Defendants' authority to sell the shares accumulated in their brokerage accounts."  Pl. Opp. at 8.  Plaintiff has done no such thing.  The reason Defendants never possessed voting power is because they never possessed any shares.  As such, they did not possess "dispositive power" either.

   1.   The Market Volume Proves That Trading Was In Book Entries

At the heart of this case is the simple fact that Defendants' trading activity was not in securities.  Their trading was not in actual securities, it was not in derivatives, it was in book entries that were tied to the share price of New Concept shares.  As the Interactive Brokers' customer trade data sets out (nearly ten million total purchases and ten million total sales during the alleged short swing period, *see* Defendants' Local Civil Rule 56.1 Statement in of Undisputed Material Facts in Support Motion for Summary Judgment (ECF Doc. No. 66) ("R-56.1") ¶¶ 22, 23, 26, 27, 30, 31, 33), Defendants (and most market participants) could not

possibly have ever taken delivery of the shares they purported to purchase, had there not been matching closed positions for most or all of the open positions. The sheer volume of market activity during the relevant period (in excess of ten million trades on each day of the alleged short swing period, including one day where over eighteen million trades were made, R-56.1 ¶¶ 20, 21, 24, 25, 28, 29, 32), demonstrates the trading environment in which the alleged short swing period occurred. Had this been a game of musical chairs, if the music had stopped at any time during the alleged short swing window, the vast market activity demonstrates that only ten to twenty percent of "purchasers" could have possessed actual New Concept "securities."[1]

### 2. Defendants Could Never Have Purchased "Securities" From Naked Short Sellers Who Did Not Ever Own Such "Securities"

The lack of evidence in support of Plaintiff's case is so glaring that it could not even get through its own brief without admitting it. For example, Plaintiff posits that "Defendants *do not and cannot* deny that they had the right to sell all of the shares purchased in their Interactive accounts when their purchases were executed, before delivery of the shares was due to the Defendants on the T+2 settlement date . . . ." Pl. Opp. at 9 (Emphasis added). But just three pages later, Plaintiff admits that Defendants *can* deny they possessed any "shares" to sell (as Defendants do, in fact, deny), acknowledging that it is not "difficult to hypothesize a situation . . . closer to the record in this case, [where] large numbers of short sales by market makers ha[d] no relation, at the moment of sale, to available shares." Pl. Opp. at 12. Plaintiff hereby admits that the "purchases" it alleges Mintbroker made had "no relation …to available shares," which has

---

[1] The number of New Concept shares owned by Cede & Co. through June 23, 2018 and available for street-side trading was 1,923,676 (the "Float). R-56.1 ¶ 19. On the lightest trading day, 7/3/18, where 10,408,300 shares were traded in the market, only approximately 20% of "purchasers" could have possibly possessed a New Concept security if trading was halted at any point on that day. On the heaviest trading day, 6/29/18, where 18,649,600 shares were traded in the market, only approximately ten percent of "purchasers" could have possibly possessed a New Concept security if trading was halted at any point on that day.

3

always been the position of Defendants in this case, and which squares with the testimony of Plaintiff's own witness, Interactive Brokers' Brad Klauseger.  Klauseger stated, in response to a hypothetical question about short selling, that the "pot" of available shares might be one million, but two brokers can (and do) each take a short position in those full million shares, meaning there would be short sales of two million shares, when only one million actual shares were available to cover the short positions.  R-56.1 ¶ 57.  Obviously, *such an event does not double the amount of actual shares available to sell, and obviously, the " purchasers" do not then own 2 million "shares*."  Rather, it means that many of the short sales could never settle because the sales did not represent actual and deliverable securities.

Inexplicably, having adopted Defendants' theory of the case, Plaintiff then urges the court to adopt the opposite position, that "Defendants bought 'actual and deliverable stock'" even if they bought from short sellers "who did not have the stock available to sell."  Not only does this premise not make any sense, the case law cited by Plaintiff does not support it.

First, *IBS Financial Corp. v. Seidman & Associates L.L.C.*, 136 F. 3d 940 (3d Cir. 1998) is a Third Circuit Court of Appeals case which is not controlling and is entirely irrelevant.  It is offered in support of Plaintiff's argument that "possession of the [investment] power is sufficient, its exercise unnecessary for its holder to be a beneficial owner." Pl. Opp. at 7.  But *IBS Financial Corp.* concerns the definition of "control" pursuant to Section 13 of the Act.  136 F. 3d at 947.  There, the court determined that the defendant could be a "controlling" person because he had the power to direct the "management and policies" of a company, whether he exercised it or not.  *Id.* In short, this case is not about beneficial ownership at all.

The rest of the cases cited in support of Plaintiff's argument that Section 16(b) applies to the trading activity here (Pl. Opp. at 5-8) concern the definition of the terms "purchase" and sale"

as they appear in Section 16(b), and most importantly (unlike in this case), concern securities, that actually existed, were owned by a long seller, and were purchased or sold.

Plaintiff argues that "so long as purchases or sales were placed by the Defendants and confirmed by their broker, the Defendants bought or sold by entering into contracts to buy or to sell," citing *Rubenstein v. Cosmos Holdings, Inc.,* No. 19 Civ. 6970 (KPF), 2020 WL 3893347, at *6 ) (S.D.N.Y. July 10, 2020).  This particular Mark Rubenstein case (a decision on a motion to dismiss which requires only a "plausible claim for relief"), concerned the purchase and sale of 100,000 actual shares of company stock, the existence of which no party disputed.  *Id.* at *1. Plaintiff's next case, *Plumber's Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, examined the definition of the term "purchaser" and concerned the purchase of actual "shares of Swiss Re's common stock," the existence of which no party disputed.  753 F. Supp. 2d 166, 172 (S.D.N.Y. 2010).  Plaintiff also cites *Donoghue v. Patterson Cos. Inc.*, a case about a prepaid variable forward contract for the sale of 200,000 shares.  990 F. Supp 2d 421, 423 (S.D.N.Y. 2013).  First and foremost, the case involved actual shares, the existence of which no party disputed.  *Id.*  Second, the proposition for which the case is offered – that the date of a contract to settle this specific type of transaction in cash is the "purchase date" – is not only irrelevant here, it was a rejection of Plaintiff's (and counsel here's) argument that an option to settle in cash is a "purchase" even if the option was not exercised.  *Id.* at 427.  Notably, this case is one of at least three cases where serial plaintiff Deborah Donoghue and her counsel (some 150 Section 16(b) cases since 2001, R-56.1 ¶¶ 69, 71) advocated for expanding the meanings of the terms "purchase" and "sale" as a means of expanding liability under Section 16(b).  This argument was rejected in all three cases on a motion to dismiss.  *See also Donoghue v. Murdock*, No 13 Civ. 1224, 2013 WL 4007565 (S.D.N.Y. Aug. 6, 2013) *and Donoghue v. Centillium*

5

*Communications, Inc.*, No. 05 Civ. 4082, 2006 WL 775122 (S.D.N.Y. Mar. 28, 2006). There is no reason for this court to stake out new ground here, either.

      B.      <u>Defendants' Trades Did Not Clear</u>

Even if the short sellers from whom Defendants purchased did possess the securities they purported to sell (they did not), the record indisputably sets forth that Defendants exited their position in New Concept securities before settlement, and therefore before any actual securities could have been deposited to Mintbroker's proprietary trading account by Interactive Brokers. As set forth in Defendants' Memorandum of Law in Support of Motion for Summary Judgment (ECF Doc. No. 65) ("Def. Br."), a securities trade date reflects "pending transactions" made on that date, whereas the settlement date is the date that reflects the "actual balance posted to [a] customer account as of [the] settlement date," and is the date upon which "the cash proceeds from the sale of a security are available" to an investor. *See In re Adler, Coleman Clearing Corp.,* 247 B.R. 51, 84 (Bankr. S.D.N.Y. 1999), *aff'd* 263 B.R. 406 (S.D.N.Y. 2001). Plainly, the cash proceeds from a book entry is not "investment power" in a security that one does not actually own and could not possibly have ever owned because it was based on a naked short sale.

Moreover, the data on clearing in this case comes directly from the Depository Trust & Clearing Corporation ("DTCC") and its subsidiaries the Depository Trust Company ("DTC") and the National Securities Clearing Corporation ("NSCC"). DTC is "the central securities depository for equity securities . . . where all securities positions are held in the U.S.[2] DTCC itself describes settlement as follows: "[i]n the financial industry, settlement is generally the term applied to the exchange of payment to the seller and the transfer of securities to the buyer of a

---

[2] DTCC, Understanding the Settlement Process, https://www.dtcc.com/understanding-settlement/index.html (last visited Sept. 29, 2020).

trade. It's the final step in the lifecycle of a securities transaction."[3] DTC data proves that Mintbroker's position in 1,804,833 shares in New Concept stock opened on June 29, 2018 did not settle, and those securities were not deposited into Mintbroker's proprietary trading account by Interactive Brokers, until July 3, 2018 - the last day of the Alleged Short Swing period and the date it exited its position in an amount of 1.891 million shares. R-56.1 ¶¶ 52-54. Mintbroker never could have had possession of 1.804 million shares it purported to "purchase" because it had exited the book-entry position entirely before those "purchases" settled (or failed to settle, as would have been the case here). In other words, even if the shares Mintbroker "purchased" on June 29, 2018 existed (they did not), because Mintbroker did not possess the 1.804 million New Concept securities it purported to purchase on June 29, 2018 before it exited that position, Plaintiff has not met its burden to establish that Mintbroker was a beneficial owner of the New Concept "securities" in question.

      Finally, Plaintiff argues (referencing Exhibit J attached to its own Motion to Dismiss, ECF Doc. No. 69-10) that "it is possible to cross-reference [the publicly available] short selling data with Defendants' reported trades to determine the portion of Defendants' counterparties who were short sellers. This statement is simply false. Indeed, if one could cross-reference short selling data to make this determination, Plaintiff would certainly have done so and highlighted the results (if they were favorable). But despite Plaintiff saying such an analysis is possible, it has not performed this analysis in order to present to the court proof of all Defendants' purchases from long sellers (who actually possessed New Concept securities to sell). This is because such an analysis cannot be done. Without dispute, the SEC "fail to deliver" data referenced in Plaintiff's Exhibit J identifies only the settlement date, security, quantity, and price of a failed

---

[3] *Id.*

trade. Defendants' Local Civil Rule 56.1 Statement in Support of their Memorandum of Law in Opposition to New Concept Energy Inc.'s Motion for Summary Judgment (ECF Doc. No. 77) ("Opp. R-56.1") ¶ 48. It does not state whether it is a purchase or sale, or the time of the transaction, and it does not identify the trade date, or the purported purchaser, seller, or broker. *Id.* The limitations of this data are inherent in the SEC's long-winded description of it – "[t]he values of total fails-to-deliver shares represent the *aggregate net balance* of shares that failed to be delivered as of a particular settlement date . . . . Fails to deliver on a given day are a cumulative number of all fails outstanding until that day, plus new fails that occur that day, less fails that settle that day. The figure *is not a daily amount of fails*, but a combined figure that includes both new fails on the reporting day as well as existing fails. In other words, these numbers reflect aggregate fails as of a specific point in time, and may have little or no relationship to yesterday's aggregate fails. Thus, it is important to note that the age of fails cannot be determined by looking at these numbers." Opp. R-56.1 ¶ 49 (emphasis added).

    C.    <u>This Trading Activity Is Not The Insider Abuse Congress Designed Section 16(b) To Remedy</u>

Congress recognized in enacting Section 16(b) "that that insiders may have access to information about their corporations not available to the rest of the investing public. By trading on this information, these persons could reap profits at the expense of less well informed investors." *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243 (1976) (internal citations omitted). *See also Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 173-74 (2d Cir. 2012) (Section 16(b), "a vital component of the Exchange Act, [ ] was designed to prevent an issuer's directors, officers, and principal stockholders from engaging in speculative transactions *on the basis of information not available to others*.") (internal quotation marks omitted) (emphasis added). Importantly, because of its strict liability nature, "where alternative

constructions of the terms of S[ection] 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders." *Foremost-McKesson, Inc.*, 423 U.S. at 244. *See also Donoghue*, 990 F. Supp. 2d at 424 (*citing Levy v. Southbrook Int'l Invs. Ltd.,* 263 F.3d 10, 16 (2d Cir. 2001)) ("[f]inancial instruments that do not fall squarely into [the 16(b)] framework are to be construed narrowly to favor the insider because of the strict-liability nature of Section 16(b)"). This case involves high-speed computer trading by non-insiders who opened positions in shares that could not possibly exist, and who did not take possession of any New Concept securities (at least those that could be delivered) until they had entirely exited their alleged 10% position. Defendants did not purchase or sell "securities." This is simply not a Section 16(b) case. And this court should resist Plaintiff's dogged attempt to expand it.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court grant their motion for summary judgment, or in the alternative, issue a ruling requiring Plaintiff to establish at trial that every "security" it alleges Defendants purchased or sold: (i) actually existed; and, (ii) came into Defendants' possession such that Defendants had "investment power" pursuant to 17 CFR 240.13d-3(a).

FORD O'BRIEN LLP


  /s/ Danielle M. McLaughlin
Adam C. Ford
Robert S. Landy
Danielle M. McLaughlin
575 5th Avenue, 17th Floor
New York, NY 10017
aford@fordobrien.com
rlandy@fordobrien.com
dmclaughlin@fordobrien.com
*Attorneys for Defendants Guy Gentile and Mintbroker International, Ltd.*

Dated: New York, New York
      October 5, 2020