## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVALON HOLDINGS CORP., | |
| Plaintiff, | |
| v. | No. 18-cv-7291 (DLC) (RJL) |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | ECF Case |
| Defendants. | |

Related to:

| | |
|---|---|
| NEW CONCEPT ENERGY, INC. | |
| Plaintiff, | |
| v. | No. 18-cv-8896 (DLC) (RJL) |
| GUY GENTILE and MINTBROKER INTERNATIONAL, LTD., | ECF Case |
| Defendants. | |

## <u>DEFENDANT GUY GENTILE'S POST-HEARING BRIEF</u>

## TABLE OF CONTENTS

FACTUAL AND PROCEDURAL BACKGROUND ..................................................3

    1.  MintBroker's operational structure and trading/recordkeeping systems................3

    2.  The InteractiveBrokers records and MintBroker Records......................................3

    3.  The present inquest on damages ...........................................................................3


LEGAL STANDARD AND BURDEN OF PROOF .........................................................7

ARGUMENT.................................................................................................................8

    1.  The MintBroker Records must be admitted into evidence because they are
necessary to accurately calculate MintBroker's short-swing profits......................8

        A.  Plaintiffs' motion *in limine* to exclude the MintBroker Records must be
denied...........................................................................................................8

        B.  The MintBroker Records reflect the vital distinction between profits from
shares beneficially owned by MintBroker and those beneficially owned by
clients........................................................................................................10

    2.  Profits derived from trading in shares beneficially owned by clients must be
excluded from the calculation of damages for which Gentile may be held liable.11

        A.  As a broker-dealer, MintBroker could not be the beneficial owner of shares
held in its clients' accounts......................................................................11

        B.  MintBroker additionally could not be considered the beneficial owner of
shares held in clients' accounts under any definition of beneficial ownership
.................................................................................................................12

    3.  Accurate calculations by two forensic accountants demonstrate that Plaintiffs
have not established any damages and a proper amount of short-swing profits
derived from Avalon (AWX) shares beneficially owned by MintBroker would be
approximately $1.2 million and that MintBroker never crossed the 10% threshold
to be deemed a statutory insider under Section 16(b) with respect to trading in
New Concept (GBR) ............................................................................................14

    4.  Plaintiffs' calculations, predicated on the incomplete InteractiveBrokers records,
and Plaintiffs' disregard for the client trading distinction, are incorrect...............16

# TABLE OF AUTHORITIES

*Gollust v. Mendell*,
  501 U.S. 115 (1991) ...............................................................................................................11

*Griffiths v. Francillon*,
  2012 WL 1341077 (E.D.N.Y. Jan. 30, 2012), *report and recommendation adopted*, 2012 WL
1354481 (E.D.N.Y. Apr. 13, 2012) ...........................................................................................8

*Lenard v. Design Studio,*
  889 F. Supp. 2d 518 (S.D.N.Y. 2012) .......................................................................................8

*Olagues v. Perceptive Advisors LLC*,
  902 F.3d 121 (2d Cir. 2018) .....................................................................................................15

*Packer v. Raging Capital Management, LLC*,
  981 F. 3d 148 (2d Cir. 2020) ....................................................................................................11

*RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l.*,
  2013 WL 1668206  (S.D.N.Y. Apr. 18, 2013), *report and recommendation adopted*, 2013 WL
4505255 (S.D.N.Y. Aug. 23, 2013)............................................................................................7

*Rubenstein v. International Value Advisers, LLC*,
  959 F.3d 541 (2d. Cir. 2020) ..........................................................................................11, 12, 13

Statutes and Rules:

15 U.S.C. § 78p(b)..............................................................................................................11

17 C.F.R. § 240.13d-3 ........................................................................................................13

17 C.F.R § 240.13d-3(a)(2)(i) ...........................................................................................14

§ 240.13d-1(b)(1)(ii)(J) .....................................................................................................12

17 C.F.R. § 240.16a-1 ..................................................................................................12, 13

Fed. R. Civ. P. 37...............................................................................................................9

Rule 13d-3(b) (§ 240.13d-3(b)) ........................................................................................12

Rule 16a-1 (17 C.F.R. § 240.16a-1(a)).........................................................................2, 11

Rule 37(c) ...........................................................................................................................8

section 15 of the Act (15 U.S.C. 78o) ...............................................................................12

Section 16(b) of the Securities Exchange Act of 1934.......................................................11

At the hearing on this inquest on damages, Plaintiffs did not present any witnesses, opting to rely entirely on their own calculations of over $14 million premised on incomplete trading records. Plaintiffs' reliance on those incomplete records fails to make even a prima facie showing to support their damages calculation, rendering their incorrect damages amount effectively null.

Nevertheless, Defendant Guy Gentile ("Gentile") has presented, through two expert reports from forensic accountants, alternative damages figures[1] based on an accurate calculation of MintBroker International, Ltd.'s ("MintBroker") short-swing profits during the relevant period. Plaintiffs had ample time to conduct discovery with respect to the conclusions in the expert reports, which they availed themselves of over the past year, conducting numerous depositions and obtaining significant document discovery. But at the hearing they presented zero evidence to refute the testimony of Gentile's four witnesses, who demonstrated that profits derived from trading in shares beneficially owned by *clients* of MintBroker must be excluded from the calculation of damages.

Specifically, the Court heard testimony from Gentile as well as MintBroker's former Information Technology Manager and two forensic accountants explaining the distinction between shares beneficially owned by MintBroker and those beneficially owned by clients. Under the definition of "beneficial ownership" under Sections 13(d), 16(b) and the exceptions to those definitions set forth in Rule 16a-1 (17 C.F.R. § 240.16a-1(a)), MintBroker may not be penalized under 16(b) for shares held or traded in client accounts. The Plaintiffs' purported damages calculation seeking over $14 million and relying on incomplete records to include clients' profits

---

[1] Using the Second Circuit's "highest-in, lowest-out" methodology, both experts concluded the MintBroker's short-swing profits were approximately $1.2 million. But Robert Christian additionally concluded that MintBroker's "actual profits," accounting for net losses, were approximately $177,491. Legally, however, Plaintiffs' failure to present damages calculations, evidence, or witnesses should lead to a finding of $0 in damages.

is incorrect. Instead, the proper calculation of short-swing profits for which MintBroker is liable to Avalon Holding Corp. ("Avalon" or "AWX") is approximately $1.2 million. It never crossed the 10% threshold to become a statutory insider under Section 16(b) with respect to New Concept Energy, Inc. ("New Concept" or "GBR"), and therefore is not liable to New Concept for any short-swing profits.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *MintBroker's operational structure and trading/recordkeeping systems.*

In 2011, MintBroker (formerly Swiss America Securities, Ltd.) became registered and licensed under Bahamian law as a broker-dealer to provide online day trading services to its clients. (Tr. #1 at 34). It began with three employees, but the company grew to up to 80 employees at one point. (Tr. #1 at 34–35). In 2018, (the relevant time period of the trading at issue in these matters), MintBroker had three or four traders that would place trades on behalf of MintBroker in the company's proprietary trading account. (Tr. #1 at 37).

At its peak, MintBroker had as many as 50,000 customer (client) accounts. (Tr. #1 at 34). MintBroker only offered self-directed accounts, whereby its customers made their own trading decisions. (Tr. #1 at 38). It did not offer managed accounts. (*Id.*). Customer trades were submitted by customers through the web-based DAS Trader system. (Tr. #1 at 38). A customer would log onto their DAS Trader account with a username and password, search for the security they wanted to trade, choose the type of order to place and the number of shares, and enter the order. (Tr. #1 at 48). The order would then get sent to MintBroker's designated server in DAS Trader, which would then either route the order to one of the clearing firms it used (*e.g.*, InteractiveBrokers) to execute

the order in the market, or it would be executed through an internal cross-trade within the DAS

Trader system.[2] (Tr. #1 at 38–39).

MintBroker's omnibus account at InteractiveBrokers functioned both as a method to hold

its own positions and to execute client transactions. (Tr. #1 at 82). As Gentile explained, when a

foreign broker-dealer, like MintBroker, opens an account at a U.S. clearing firm, the clearing firm

recognizes the broker-dealer as the account holder, but understands that it is utilizing the omnibus

account to execute trades on behalf of its underlying clients. (Tr. #1 at 82). In this case,

InteractiveBrokers was not provided with the names of MintBroker clients who were trading

through the omnibus account and had no way of identifying whether a trade in the omnibus account

was placed on behalf of MintBroker or a client. (Tr. #1 at 83) (B. Klauseger, Tr. at 7–8).

### 2. *The InteractiveBrokers records and MintBroker Records.*

On February 24, 2020, Gentile sat for a deposition in this matter and repeatedly testified

that trades reflected in MintBroker's omnibus proprietary trading account executed through

InteractiveBrokers included client (customer) trades. Following a question indicating that the

trades in June, July, and August 2018 were "all proprietary trading" Gentile clarified:

> A. [G. Gentile]: No, because we had clients at that time also and we're not talking
> about what my clients were trading. We're just talking about the proprietary
> trades... so like whatever the clients traded is separate from whatever I traded.

(Gentile Tr. #1 pg. 44). In fact, he was specifically asked if the records presented by Plaintiffs

were MintBroker proprietary trades and responded: "I don't know that for a fact" as "[t]hey could

have included client transactions as well." (Gentile Tr. #1, pg. 47). Gentile emphasized multiple

---

[2] As Gentile testified at the hearing, the DAS Trader system enabled internal cross-trading as a method of efficiently executing multiple customer trades in certain circumstances (one buying, one selling the same security) because clearing firms do not allow wash trading in the market and, when trading in an omnibus account, clearing firms cannot see that the trades are on behalf of two separate beneficial owners. (Tr. #1 at 39–40).

times in his first deposition that the data and records presented by the Plaintiffs may reflect trading by both MintBroker and clients.  (Gentile Tr. #1, pgs. 44, 47, 55-56).

For recordkeeping purposes, MintBroker also used a system called iBoss (Internal Back Office Support System). (Tr. #1 at 44, 119). The iBoss system essentially self-populated data with information concerning executed trades received directly from the DAS system. (Tr. #1 at 119, 170). The data contained in the iBoss system *could not be altered*, as it was a "view-only system." (Tr. #1 at 46, 48, 72) (Darville Tr. pg. 21-22). Records imported directly from the iBoss system and produced to the Plaintiffs in May 2022 (the "MintBroker Records") identify account names with respect to their trading activity. In those records, MintBroker's proprietary trading account was identified as account #32810, its journal entry recordkeeping account was identified as account # 32812, and its client accounts were identified based on their account names starting with the letters "PFS" or "MBS." (Darville, Tr. at 28; Tr. #1 at 5; Tr. #2 at 47). But in the InteractiveBrokers records concerning the omnibus account, those identifiers are not present and instead, client accounts and company accounts are indistinguishable. (B. Klauseger Tr. at 7–8).

### 3. *The present inquest on damages.*

By late December 2021 Gentile had lost his challenge to MintBroker's provisional liquidation, and the company, devoid of assets or cash other than money owed to Gentile, was placed into official liquidation, which Gentile understood opened the door for him to seek company documents. But the cross-motions for summary judgment filed in August 2020 remained undecided and these matters were effectively dormant until April 8, 2022, when Plaintiffs were granted summary judgment against both Defendants[3] under Section 16(b)'s strict liability remedy

---

[3] On September 20, 2022, Gentile notified the Court of his understanding that Plaintiffs lack Article III standing with respect to MintBroker and moved to vacate the summary judgment order and dismiss Plaintiffs' claims as to MintBroker, which was denied.

(the validity of which is presently before Judge Cote pending Gentile's Motion to Dismiss for Lack of Standing).

After the April 8, 2022 Order, Gentile reached out to several former MintBroker officers and learned that although MintBroker's former counsel and the Securities Commission of the Bahamas ("SCB") were the sole custodians of MintBroker's records, former MintBroker Information Technology Manager Stephen Darville ("Darville") maintained the capacity to rebuild MintBroker's iBoss trading system and import trade blotter information from DAS Trader. (Darville Tr. pgs. 32-33, 43-45). In late April or early May 2022, Darville rebuilt MintBroker's latent iBoss system, which accurately populated data from DAS Trader. (Darville Tr. at 32–33).

On May 9, 2022, Gentile's counsel notified Plaintiff via email about the MintBroker Records. That same day, Avalon moved for entry of judgment against MintBroker and Gentile (jointly and severally) in the amount of $6,235,908, plus prejudgment interest in the amount of $1,073,150, for a total award of $7,309,058 (Avalon, Dkt. 100), and New Concept moved for entry of judgment seeking the amount of $6,102,002, plus prejudgment interest in the amount of $1,077,315, for a total award of $7,179,317. (New Concept, Dkt. 89).

With respect to the MintBroker Records, Gentile engaged two independent forensic accountants to calculate short-swing profits for shares beneficially owned by MintBroker in Avalon (AWX) and New Concept (GBR). (Tr. #2 at 9). The first accountant, Robert Christian ("Christian"), met with Darville, who demonstrated the iBoss system through a videoconference "walk-through." (Tr. #2 at 10). Darville then provided Christian with credentials which gave Christian direct remote access to iBoss. (Tr. #2 at 10). Darville described the process of providing Christian with direct access to the iBoss system and further testified that Gentile did not place any limits on the types of documents Darville could share with the experts.  (Darville Tr. at 42–44, 88).

Through his direct remote access, Christian generated reports for AWX and GBR for the relevant time period. (Tr. #2 at 10). He used mechanisms to become comfortable with the account name distinction between client accounts and MintBroker accounts and determined that account #32810 was the "corporate trading account" relevant for purposes of determining short-swing profits. (Tr. #2 at 22, 52–53). Both Gentile and Christian testified that the #32810 account featured both company propriety trades as well as some instances of inventory trades. (Tr. #1 at 53; Tr. #2 at 22–23). Gentile explained: "If the firm, for example, had a thousand shares of a particular stock long or short, and a client placed an offsetting trade, the system, meaning the DAS system, would automatically execute against inventory first before routing out to the market." (Tr. #1 at 53). He also explained that because trades reflected in the #32810 account could have been client orders filled from MintBroker's inventory, determination of beneficial ownership requires filtration of the data to determine who initiated the transaction, MintBroker or a client. (Tr. #1 at 128–129). This is precisely what the forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. (Tr. #2 at 22–23, 35).

Using these methodologies, Christian concluded that MintBroker did not cross the 10% beneficial ownership with respect to New Concept (GBR) and that MintBroker's short-swing profits with respect to Avalon (AWX) were approximately $1.2 million. (Tr. #2 at 45) (Defendant's Exhibit #1, Independent Accountant's Report of C. Christian). An additional forensic accountant, Brenden Beresford ("Beresford") relied on representations regarding the distinctions between client account names, the MintBroker proprietary account, and client offset inventory trades and reached the same conclusion. (Defendant's Exhibit #19, Forensic Accountant's Report of B. Beresford).

7

Now, despite Plaintiffs' opportunity to conduct discovery regarding the MintBroker Records, they have presented no evidence rebutting the experts' calculations and still seek a total award against MintBroker and Gentile, jointly and severally, in the amount of **$14,488,375**.

## LEGAL STANDARD AND BURDEN OF PROOF

On an inquest for damages, the burden of proof falls on the plaintiff who must introduce sufficient evidence to establish the amount of damages. *RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l.*, 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013), *report and recommendation adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013). "Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, the court should decline to award damages, even though liability has been established . . . ." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012); *see also Griffiths v. Francillon*, 2012 WL 1341077, at *1 (E.D.N.Y. Jan. 30, 2012) (recommending that no damages be awarded because motion papers alone were insufficient to support an award of damages), *report and recommendation adopted*, 2012 WL 1354481, at *1 (E.D.N.Y. Apr. 13, 2012).

## ARGUMENT

1. **The MintBroker Records must be admitted into evidence because they are necessary to accurately calculate MintBroker's short-swing profits.**

   A. Plaintiffs' motion *in limine* to exclude the MintBroker Records must be denied.

Plaintiffs' motion *in limine* effectively asks this Court to sanction Gentile under Rule 37(c) in the amount of $15 million for his inability to obtain the MintBroker Records at an earlier date. But Plaintiffs were provided nearly a year in which to conduct broad discovery on these records and, in fact, obtained significant additional document discovery and conducted 4 depositions. These records must be admitted and considered, since they are the only records that permit accurate

calculation of short-swing profits, and Plaintiffs have failed present evidence or testimony to rebut them.

As described above, MintBroker customer trades were submitted by customers through the web-based DAS Trader system, which functioned as the trading platform. (Tr. #1 at 38–39, 119). Gentile and Darville (the custodian of the MintBroker records) described how the data was automatically transmitted from DAS Trader into the iBoss system and affirmed that it could not have been altered. (Darville Tr. pg. 20–22; Tr. #1 at 46, 48, 72, 119, 170). Darville also testified that he understood that when he rebuilt the iBoss system, the data populated correctly. (Darville Tr. at 32–33). With respect to the completeness of the records, Darville also testified: "as far as I know, that would have been all of the records present in the system at that time." (Darville Tr. at 83). Christian then generated his reports based on data extracted directly from the iBoss system. (Tr. #2 at 10).

Gentile's production of the MintBroker Records in May 2022 was both *justified* and *harmless* to the Plaintiffs. *See* Fed. R. Civ. P. 37. As described in detail in Gentile's opposition to their motion *in limine* and at the hearing, Gentile had a good faith reason for the timing of his production of the MintBroker Records because he lost access to company records when MintBroker was shutting down prior to the time his discovery responses in these matters were due and remained unable to obtain company documents during the pendency of his challenge to its court-supervised provisional liquidation. In fact, Gentile testified that he tried to obtain company records from MintBroker's attorneys in late 2019, but they refused to provide him with access because he had already surrendered his broker-dealer license. (Tr. #1 at 73–74).

And, critically, Plaintiffs were not prejudiced by the production of the MintBroker Records in May 2022. As of early 2020, they were aware that the InteractiveBrokers records they rely on

reflect trading of shares beneficially owned by MintBroker's clients, but that the InteractiveBrokers records do not feature identifiers which would distinguish those accounts. As of 2020, Plaintiffs had the opportunity to conduct discovery on this precise issue but declined. They did not attempt to obtain MintBroker's records through the proper channels (the letters rogatory process) despite their understanding, as represented to the Court at the hearing, that *five sources in the Bahamas other than Gentile* had possession of the records. (Tr. #1 at 6–7). When asked for clarification regarding the "five different people or entities" in "possession" of the documents, Plaintiffs' counsel affirmed their understanding that only those five sources had possession of the documents and did not mention Gentile. (Tr. #1 at 7).

Plaintiffs chose to disregard the significance of the client trading distinction presented by the MintBroker Records until forced to confront it in this inquest on damages. In the past year, Plaintiffs deposed Gentile, both expert witnesses, and the custodian of the documents. They requested and obtained additional documents and had the opportunity to engage additional experts to challenge the MintBroker Records but chose not to.  Consideration of the MintBroker Records is necessary to accurately calculate MintBroker's short-swing profits and Plaintiffs' motion to exclude them must be denied.

B.  <u>The MintBroker Records reflect the vital distinction between profits from shares beneficially owned by MintBroker and those beneficially owned by clients</u>.

Plaintiffs have presented no evidence to rebut the clear distinction between client trades and company trades. Gentile, Darville, and Christian all repeatedly testified that account names beginning with letters (specifically, "PFS" or "MBS") represent individual client accounts. (Tr. #1 at 50, 52; Tr. #2 at 47, 104; Darville Tr. at 28). The identifiable account names, which reflect the distinction between shares beneficially owned by clients and those owned by MintBroker, are

reflected in the MintBroker Records but not in the InteractiveBrokers statements relied on by Plaintiffs, as explained by InteractiveBrokers. (Klauseger Tr. at 7–8).

In July 2018, thousands of trades were placed in AWX on behalf of clients with lettered account names. (Tr. #1 at 55–57). In fact, the data reflected in the MintBroker Records, organized in Defendant's Exhibit #8, shows that approximately 700 and 900 individual client accounts traded AWX and GBR, respectively, during the specified timeframe in the records. (Tr. #1 at 163). And we know that each were separate individual clients because MintBroker had a policy that did not allow clients to hold multiple accounts. (Tr. #1 at 163) (Darville Tr. at 62). Because the MintBroker Records reflecting trades of shares beneficially owned by clients speak directly to the issue of MintBroker's liability for its own short-swing profits, they are necessary to accurately calculate damages.

**2. Profits derived from trading in shares beneficially owned by clients must be excluded from the calculation of damages for which Gentile may be held liable.**

   A. <u>As a broker-dealer, MintBroker could not be the beneficial owner of shares held in its clients' accounts</u>.

"To prevent insiders of a securities issuer from trading on material non-public information, Section 16(b) of the Securities Exchange Act of 1934 imposes strict liability on certain insiders of an issuer, requiring them to disgorge to the issuer any profits they realize from short-swing trading in the issuer's securities." *Rubenstein v. International Value Advisers, LLC*, 959 F.3d 541, 543 (2d. Cir. 2020). This is known as the "short-swing profit rule." *Id.* at 544. "Among the insiders subject to the rule are directors and officers of the issuer, as well as '[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security.'" *Id.* at 543–43 (quoting 15 U.S.C. § 78p(b)). But because it "imposes a form of strict liability," courts have been "reluctant to exceed a literal, 'mechanical' application of the statutory text in

determining who may be subject to liability." *Packer v. Raging Capital Management, LLC*, 981 F.

3d 148, 154 (2d Cir. 2020) (citing *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 126 (2d Cir.

2018) (quoting *Gollust v. Mendell*, 501 U.S. 115, 122 (1991))).

Section 16's scope is further limited by exemptions set forth in Rule 16a-1 (17 C.F.R. §

240.16a-1), which provides:

(a) The term beneficial owner shall have the following applications:

(1) Solely for purposes of determining whether a person is a beneficial owner of
more than ten percent of any class of equity securities registered pursuant to section
12 of the Act, the term "beneficial owner" shall mean any person who is deemed a
beneficial owner pursuant to section 13(d) of the Act and the rules thereunder;
provided, however, that **the following institutions or persons shall not be
deemed the beneficial owner of securities of such class held for the benefit of
third parties or in customer or fiduciary accounts in the ordinary course of
business** . . . as long as such shares are acquired by such institutions or persons
without the purpose or effect of changing or influencing control of the issuer or
engaging in any arrangement subject to Rule 13d-3(b) (§ 240.13d-3(b)):

(i) A broker or dealer registered under section 15 of the Act (15 U.S.C. 78o);

***
(x) A non-U.S. institution that is the functional equivalent of any of the institutions
listed in paragraphs (a)(1)(i) through (ix) of this section, so long as the non-U.S.
institution is subject to a regulatory scheme that is substantially comparable to the
regulatory scheme applicable to the equivalent U.S. institution and the non-U.S.
institution is eligible to file a Schedule 13G pursuant to § 240.13d-1(b)(1)(ii)(J).[4]

(17 C.F.R. § 240.16a-1). This is understood to mean a covered institution's "customers' holdings

do not count towards its own holdings." *Rubenstein*, 959 F.3d at 548. Thus, Rule 16a-1's

exemption makes clear that MintBroker was not the beneficial owner of shares reflected in its

omnibus account at InteractiveBrokers for which it was simply acting as a custodian for shares

beneficially owned by its customers.

---

[4] As a Bahamian broker-dealer, MintBroker was properly registered and licensed in the Bahamas and was subject to
a regulatory scheme that is substantially comparable to the regulatory scheme applicable to U.S. broker-dealers. For
example, like in the U.S., MintBroker and Gentile were required to hold specific regulatory licenses to conduct
business as a broker-dealer. (Tr. #1 at 74).

B. **MintBroker additionally could not be considered the beneficial owner of shares held in clients' accounts under any definition of beneficial ownership.**

The fact that MintBroker, as a broker-dealer acting as the custodian for shares beneficially owned by clients, is a covered institution excluded from the definition of "beneficial ownership" under Rule 16a-1 is alone sufficient to conclude that Plaintiffs' calculations, including client profits, are incorrect. Nevertheless, MintBroker cannot be considered the beneficial owner of the shares reflected in the clients' accounts under any definition of beneficial ownership.

Notwithstanding the exemption of covered institutions, which does apply to MintBroker, Rule 16a-1 also explains that, generally "for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered pursuant to section 12 of the Act, the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Act . . ." 17 C.F.R. § 240.16a-1.

Rule 13(d)-3, titled "Determination of beneficial owner," provides:

a) For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,

(2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3. In this case, Plaintiffs have presented no evidence that MintBroker had voting power or investment power with respect to shares traded by its clients. In fact, all evidence presented reflects the contrary.

At the hearing, this Court heard that Plaintiffs deposed a corporate representative of InteractiveBrokers, Brad Klauseger, in May 2020. (Tr. #1 at 17). With respect to voting rights of shares in the InteractiveBrokers omnibus account, Klauseger testified: "I believe that you only

13

have the proxy voting rights if you hold the long position, And that would be the *underlying customer* of the Omnibus structure." (B. Klauseger Tr. at 113–114) (emphasis added). Gentile similarly testified that for client purchases of shares through MintBroker as a broker-dealer, the client would have the voting rights with respect to those shares. (Tr. #1 at 81). And, with respect to the capability to dispose of a share that a client purchased through MintBroker, Gentile explained that MintBroker was unable to do so "without the permission of the client, or subject to a margin liquidation." (Tr. #1 at 81–82).

Finally, Rule 16a-1(a)(2)[5] describes yet another definition of beneficial ownership which the Second Circuit has suggested "narrows the class of transactions subject to [Section 16] by defining 'beneficial owner' as 'any person who, directly or indirectly . . . has or shares direct or indirect pecuniary interest in the equity securities.'" *Rubenstein*, 959 F.3d at 548, n.1. "A pecuniary interest is an 'opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities.'" *Id*. (quoting 17 C.F.R § 240.13d-3(a)(2)(i)). As Gentile described at the hearing, MintBroker facilitated "riskless principal trading" whereby the company did not have any risk or interest in the outcome of the transaction passing through its inventory account and did not profit from those transactions. (Tr. #1 at 93, 182). Thus, MintBroker did not profit from short-swing profits realized in its clients' accounts, including those trades that passed through its inventory account.

For these reasons, under every possible definition of beneficial ownership for purposes of calculating short-swing profits under Section 16(b), the clients were the beneficial owners of their

---

[5] It is unclear whether Rule 16a-1(a)(2)'s reference to a "pecuniary interest" even applies, given it seems to exclude such inquiry "for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered under Section 12 of the Act," 17 C.F.R. § 240.13d-3, but in any event, MintBroker did not have a pecuniary interest in its clients' shares.

shares and MintBroker was merely a custodian which cannot be held liable for its clients' short-swing profits.

3. **Accurate calculations by two forensic accountants demonstrate that Plaintiffs have not established any damages and a proper amount of short-swing profits derived from Avalon (AWX) shares beneficially owned by MintBroker would be approximately $1.2 million and that MintBroker never crossed the 10% threshold to be deemed a statutory insider under Section 16(b) with respect to trading in New Concept (GBR).**

Because MintBroker was not the beneficial owner of trades of shares beneficially owned by its clients, as identified by their account names beginning with letters reflected in the MintBroker Records, those transactions were properly excluded by the forensic accountants in their calculations of MintBroker's short-swing profits. Additionally, entries reflected in account #32812 were also properly excluded because they reflect journal entry recordkeeping, not actual trading activity. (Tr. #1 at 48, 51; Tr. #2 at 18–19) (Christian testified: "32812 . . . without question is a recordkeeping account").

What remains then, with respect to MintBroker's short-swing profits analysis, is the activity reflected in MintBroker's propriety trading account, #32810. (Tr. #1 at 53). Because the #32810 account featured both company propriety trades as well as some instances of client trades facilitated through MintBroker's inventory, it is not possible to determine on the face of the entries in that account who the beneficial owner of the shares was. (Tr. #1 at 53, 57–58). Instead, the data for the #32810 account needs to be filtered to determine who initiated the transaction, MintBroker or a client. (Tr. #1 at 58, 128–129). This is precisely what the forensic accountant, Christian, did by locating exact replicate offsetting trades in client accounts. (Tr. #2 at 22–23, 35). Specifically, Christian testified that he was able to "isolate . . . the true corporate trades" of MintBroker from those client trades executed through inventory by locating "offsetting" #32810 trades "at the exact same time as a client trade." (Tr. #2 at 23, 35). And in his testimony, Gentile clarified that

15

MintBroker's initial acquisition of those shares into inventory, purchased through its proprietary account, were counted as part of the experts' calculations of MintBroker's short-swing profits. (Tr. #1 at 58–59).

Upon proper exclusion of the account #32812 journal entries and trades of shares beneficially owned by clients, both experts concluded that MintBroker never crossed the 10% threshold to be deemed a statutory insider under Section 16(b) with respect to trading in New Concept (GBR) and that its short-swing profits of shares of Avalon (AWX) beneficially owned by MintBroker totaled approximately $1.2 million. Plaintiffs have presented no evidence to refute or rebut the accuracy of the experts' reports or calculations. Nor have Plaintiffs presented any evidence to support a finding of any damages award.

### 4. Plaintiffs' calculations, predicated on the incomplete InteractiveBrokers records, and Plaintiffs' disregard for the client trading distinction, are incorrect.

As Plaintiffs' counsel observed in opening argument: "if you ignore the way the business is being conducted, you come up with some curious results." (Tr. #1 at 8). This is the precise problem with Plaintiffs' calculations. Relying on InteractiveBrokers records, which reflect omnibus trading and do not distinguish between trades placed by MintBroker and trades placed by its clients, Plaintiffs seek to disregard the fundamental inquiry before this Court: whether Gentile may be held liable for short-swing profits derived from trading *by its clients*. Not only have the Plaintiffs presented *no evidence* in support of their positions, but after nearly a year of discovery with respect to the MintBroker Records, Plaintiffs have presented nothing to rebut their authenticity, completeness, accuracy, and reliability—instead relying on their incendiary attacks on Gentile's credibility in hopes that this Court would never consider the records. They did not engage an expert to challenge the documents themselves nor the calculations presented by

16

Gentile's two independent forensic accountants. Their overstated calculations, relying on the InteractiveBrokers records alone, are incorrect.

To be clear, every trade reflected in the InteractiveBrokers records is also reflected in the MintBroker Records. The data that Christian pulled directly from the iBoss system includes entries for all of those trades executed through InteractiveBrokers (as well as other execution firms) and those entries match up to the InteractiveBrokers records Plaintiffs rely on. So, there is no doubt the MintBroker Records are complete from that perspective. The difference, however, is that the MintBroker Records include identification of the account placing each trade—which is fundamental to determination of whether short-swing profits were derived from shares beneficially owned by MintBroker's clients, as opposed to the Company.

At the hearing, this Court heard that Plaintiffs deposed a corporate representative of InteractiveBrokers, Brad Klauseger, on May 27, 2020—three months after Gentile alerted Plaintiffs to the fact that client trades were reflected in the omnibus account. (Tr. #1 at 17). Klauseger testified:

> A. [B. Klauseger]: With an Omnibus Account, Interactive Brokers is unable to see the number of customers that hold any particular position behind the US or UL account.
>
>         ***
>
> Q. [M. Tauber]: So it would be sort of grouped in with the any customer trading and there is no way from your end to separate it out?
>
>     A. Correct.

(Klauseger Tr. at 7–8). Thus, Klauseger affirmed that through the InteractiveBrokers records alone one cannot determine which trades were placed for shares beneficially owned by MintBroker versus those beneficially owned by its clients. And from the time of his deposition in May 2020, Plaintiffs knew the records they relied on were from MintBroker's InteractiveBrokers omnibus

account, that there were clients trading in that account, that it was segregated into long and short sub-accounts to accommodate client trading, and that it was the clients that had the right to vote or dispose of those shares. (Klauseger Tr. at 7–8, 113–114).

So, as of early 2020, Plaintiffs were alerted to the client trading distinction and had the opportunity to conduct discovery on this precise issue but declined. They did not attempt to obtain MintBroker's records through the proper channels (the letters rogatory process) despite their understanding, as represented to the Court at the hearing, that *five sources in the Bahamas* had possession of the records. (Tr. #1 at 6–7).

Instead, Plaintiffs chose to disregard the client trading distinction until forced to confront it upon Gentile's production of the MintBroker Records in May 2022. Once faced with MintBroker's accurate trading records, imported directly from the DAS Trader system, Plaintiffs surely realized the significance of the client trading distinction, but dug their heels into their original miscalculation of approximately $15 million in damages based on the incomplete InteractiveBrokers Records. They did not review their calculations in light of the MintBroker Records, nor did they engage experts to investigate or challenge the records themselves, the client trading distinction, or to conduct calculations for comparison to the InteractiveBrokers records. Plaintiffs' calculations, relying on the incomplete InteractiveBrokers records and ignoring the fact that client shares traded in the omnibus account undoubtedly were *beneficially owned by clients*, are not only grossly overstated, but incorrect.  Plaintiffs have failed to satisfy their burden.

Dated: April 19, 2023                               FORD O'BRIEN LANDY LLP

_____

Matthew A. Ford
Cara J. Filippelli (*pro hac vice*)
275 Madison Avenue, Fl.24
New York, NY 10016

mford@fordobrien.com
cfilippelli@fordobrien.com
212.858.0040

*Attorneys for Defendant Guy Gentile*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 19th

day of April 2023 via CM-ECF on all counsel.

By:    **Matthew A. Ford /s/**
         Matthew A. Ford

19